# Exhibit B

Cause No. D-1-GN-25-002212

| | | |
|---|---|---|
| ROSS PONDER AND SARAH PONDER, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY, AND AS NEXT FRIEND | § | |
| OF H.P., L.P., and R.P., MINORS, | § | |
| *Plaintiffs,* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC.; | § | |
| RONALD GRAE BAKER, INDIVIDUALLY; | § | |
| and JINNY GONZALEZ, INDIVIDUALLY, | § | |
| *Defendants.* | § | 345TH DISTRICT COURT |

---

## DEFENDANTS' SPECIAL EXCEPTIONS, ORIGINAL ANSWER, AND AFFIRMATIVE DEFENSES

---

TO THE HONORABLE JUDGE OF THIS COURT:

Defendants Austin Montessori School, Inc., Ronald Grae Baker, Individually, and Jinny Gonzalez, Individually (collectively "Defendants") file their Special Exceptions, Original Answer, and Affirmative Defenses to the First Amended Complaint ("Petition") filed by Plaintiffs.

## SPECIAL EXCEPTIONS

The purpose of a special exception is to compel clarification of pleadings when the pleadings are not clear or sufficiently specific or fail to plead a cause of action. *Friesenhahn v. Ryan*, 960 S.W.2d 656, 658 (Tex. 1998). Special exceptions are used to identify defects in a pleading, including both vagueness and the failure to state a cognizable cause of action, to allow the opposing party to cure them by amendment, if possible. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000); *Mowbray v. Avery*, 76 S.W.3d 663, 677 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied). The trial court has broad discretion in granting special exceptions to order more definite pleadings as a particular case may require. *Perry v. Cohen*, 285 S.W.3d 137, 142, 146 (Tex. App.—Austin 2009, pet. denied).

1)      **Retaliation Claim (Count 12).** Defendants specially except to Plaintiffs' live pleading on the grounds that Plaintiffs' retaliation allegations fail to state a legally recognized cause of action under Texas law. Plaintiffs' first amended petition appears to assert a generic claim of "retaliation" (paragraphs 55, 108-110) arising from decisions made in the administration or enrollment practices of a private daycare or childcare provider. However, Texas law does not recognize a standalone cause of action for retaliation in this context. Nowhere in the first amended petition as a whole, or in paragraphs 55, 108-110, do Plaintiffs identify what statute or law they rely on to support a standalone state-law retaliation cause of action in this context. Absent an express statutory basis, such as the Americans with Disabilities Act, Title IX, or another applicable anti-retaliation statute, a plaintiff cannot maintain a general state-law claim for "retaliation" against a private entity operating in a daycare or childcare capacity. To the extent Plaintiffs' attempts to assert the ADA as a basis for this claim, Plaintiffs' expressly withdrew these claims in federal court, which the federal court acknowledged. *See* **Exhibit A**, Report and Recommendation of the United States Magistrate Judge.[1] Because Plaintiffs' first amended petition fails to identify any such statutory foundation for their retaliation claim, Defendants request that the Court make an order sustaining this special exception, requiring that Plaintiffs amend their first amended petition to plead sufficient facts and legal basis its retaliation claim by a date certain, and providing that if and to the extent that Plaintiffs fail or refuse to amend, their retaliation claims be dismissed.

2)      **Unauthorized Practice of Medicine/Retaliation Claims.** Defendants specially except to Plaintiffs' live pleading generally, and specifically to paragraphs 9, 11, 14, 47, 55, 74, and 108-110, on the grounds that Plaintiffs' standalone claim alleging the unlicensed practice of

---

[1] The exhibits to the federal court pleadings are being provided as a courtesy to the court as it does not appear as though the federal court pleadings have been filed with the state court.

medicine fails to state a legally cognizable cause of action under Texas law. *Aguirre v. Tristar Risk Mgmt.,* No. C-10-394, 2011 WL 248199, at *6 (S.D. Tex. Jan. 24, 2011) (finding no private cause of action for the unauthorized practice of medicine under the Texas Occupations Code); *Patel v. Rios*, No. 01-20-00856-CV, 2022 WL 3649348, at *7 (Tex. App.—Houston [1st Dist.] Aug. 25, 2022, pet. denied) (finding the plaintiff lacked standing to bring unauthorized practice of medicine claims because no private cause of action for the unauthorized practice of law under the Texas Occupations Code). Texas law does not recognize a civil cause of action for unauthorized practice of medicine. Nonetheless, Paragraph 74 of the Plaintiffs' first amended petition alleges:

> Under Tex. Occ. Code §§ 151.002(13), 165.152, any person who diagnoses or treats a physical or mental condition without a license commits a statutory violation. By diagnosing H.P. to have an "underdeveloped will," prescribing a treatment plan, monitoring the child's response, and usurping a licensed physician's authority, Gonzalez engaged in the unlicensed practice of medicine.

*See* Exhibit B ¶ 74, Plfts' 1st Amend. Pet.

While Tex. Occ. Code § 151.002(13) broadly defines the "practice of medicine," it is a definitional provision that does not create a private civil cause of action. Similarly, Tex. Occ. Code § 165.152 concerns penalties and enforcement mechanisms related to unauthorized practice, including criminal and administrative sanctions, but it does not provide for a civil remedy. Because Plaintiffs fail to identify any cognizable statutory or legal foundation for a civil cause of action based on the alleged unauthorized practice of medicine, their claim is legally insufficient. Accordingly, Defendants request that the Court sustain this special exception and order Plaintiffs to amend their first amended petition to plead sufficient facts and a valid legal basis for their civil claim regarding the practice of medicine by a date certain. Defendants further request that if Plaintiffs fail or refuse to amend, their claims related to the unauthorized practice of medicine be dismissed with prejudice.

3)      **Failure to Accommodate Claims**. Defendants specially except to Plaintiffs' live pleading, or in paragraphs 30, 43, 63(f), 67, because Plaintiffs' standalone failure to accommodate claim fails to state a legally recognized cause of action under Texas law. Texas law does not recognize a standalone cause of action for failure to accommodate in this context. Nowhere in the first amended petition as a whole, or in paragraphs 30, 43, 63(f), 67, do Plaintiffs identify what statute or law they rely on to support a standalone state-law failure to accommodate cause of action against any of the defendants in this context. Absent an express statutory basis, such as Section 504 of the Rehabilitation Act, a plaintiff cannot maintain a general state-law claim for failure to accommodate against a private entity operating in a daycare or childcare capacity. Moreover, following removal of this case to the federal court, "Plaintiffs removed all federal claims, leaving only claims under state law, so the Court no longer has subject matter jurisdiction." *See* attached **Exhibit A**. Consequently, Plaintiffs' first amended petition fails to identify any such statutory or legal foundation for their failure to accommodate claim. Defendants request that the Court make an order sustaining this special exception, requiring that Plaintiffs amend their first amended petition to plead sufficient facts and legal basis for its failure to accommodate claim by a date certain, and providing that if and to the extent that Plaintiffs fail or refuse to amend, their failure to accommodate claims be dismissed.

4)      **No Intentional Tort Independent of Breach of Contract**. Defendants' specially except to Plaintiffs' pleadings because they have failed to allege an intentional tort that is independent of their claim for breach of contract. Before tort damages accrue from a contractual matter, liability must arise independent of the fact that a contract exists between the parties. Plaintiffs' first amended petition fails to identify any independent tort. Defendants request that the Court make an order sustaining this special exception, requiring that Plaintiffs amend their first

amended petition to plead sufficient facts and legal basis of their tort claims by a date certain, and providing that if and to the extent that Plaintiffs fail or refuse to amend, their failure to accommodate claims be dismissed.

5) **Negligence Claims (Count 1).** Defendants specially except to Plaintiffs' negligence claims. Under Texas law, a plaintiff asserting negligence must plead and prove the existence of a duty, a breach of that duty, proximate cause, and damages. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). A general reference to negligent conduct, without identifying the duty breached or facts supporting causation, is legally insufficient. *See* **Exhibit B** at 11-12. Accordingly, Defendants request that the Court sustain this special exception and order Plaintiffs to amend their first amended petition to replead their negligence claim with the specificity required by Texas law. If Plaintiffs are unable or unwilling to cure the pleading defects, the negligence claim should be dismissed.

6) **Negligence *Per Se* Claims (Count 2).** Negligence *per se* is a method of proving breach of duty, not a standalone cause of action. No express or implied private cause of action exists under the administrative codes cited by Plaintiffs. Defendants therefore specially except to Plaintiffs' first amended petition generally and specifically to paragraphs 69-73 as follows:

A.    *Alleged Violations of TAC Nap Time and Food Service Regulations.* Defendants specially except to Plaintiffs' live pleading generally, and specifically to paragraph 73, on the grounds that Plaintiffs' standalone claim alleging violations of the Texas Administrative Code provisions governing nap times and food service (26 TAC §§ 746.2901–2911 and 746.3301–3321) fails to state a legally cognizable cause of action under Texas law. Texas law does not recognize a private civil cause of action based solely on alleged violations of these regulatory provisions. Paragraph 73 of Plaintiffs' first amended petition alleges:

> AMS failed to comply with the regulations regarding nap times and food service for H.P. as set forth in 26 TAC §§ 746.2901–2911 and 746.3301–3321. H.P. and R.P. were forced to nap for more than an hour. H.P. was not allowed to have unhurried meals.

*See* Exhibit B ¶ 73.

While these sections of the Texas Administrative Code establish minimum standards for child-care facilities, including nap time durations and food service practices, they are regulatory provisions intended for administrative enforcement and do not create a private civil cause of action. Because Plaintiffs fail to identify any statutory or legal authority recognizing a private cause of action for alleged violations of these TAC provisions, their claims lack a valid legal foundation and are insufficient as a matter of law. Accordingly, Defendants request that the Court sustain this special exception and order Plaintiffs to amend their first amended petition to plead sufficient facts and a valid legal basis for any claim premised on these regulations by a date certain. Defendants further request that if Plaintiffs fail or refuse to amend, their claims related to the alleged violations of the TAC nap time and food service regulations be dismissed with prejudice.

B.    *Alleged Violations of TAC Emotional Support Regulations.* Defendants specially except to Plaintiffs' live pleading generally, and specifically to paragraph 72, on the grounds that Plaintiffs' standalone claim alleging violations of Texas Administrative Code Section 26 TAC § 746.2601 fails to state a legally cognizable cause of action under Texas law. Texas law does not recognize a private civil cause of action based solely on alleged violations of this regulatory provision. Paragraph 72 of the Plaintiffs' first amended petition alleges:

> AMS failed to encourage the Ponder children to express feelings and failed to give appropriate attention as required by 26 TAC § 746.2601. When H.P. was upset or speaking loudly, he was sent to a bathroom, sometimes without lights on.

*See* Exhibit B ¶ 72.

While 26 TAC § 746.2601 establishes standards related to emotional support and attention in child-care facilities, this provision is regulatory in nature and intended for administrative enforcement. It does not create a private civil cause of action. Because Plaintiffs fail to identify any statutory or legal authority recognizing a private cause of action based on alleged violations of 26 TAC § 746.2601, their claim is legally insufficient. Accordingly, Defendants request that the Court sustain this special exception and order Plaintiffs to amend their first amended petition to plead sufficient facts and a valid legal basis for any claim premised on this regulation by a date certain. Defendants further request that if Plaintiffs fail or refuse to amend, their claim related to the alleged violation of 26 TAC § 746.2601 be dismissed with prejudice.

7) **Gross Negligence Claims (Count 3).** Defendants specially except to Plaintiffs' gross negligence allegations on the ground that gross negligence is not a standalone cause of action under Texas law. Rather, gross negligence is a heightened form of negligence relevant only to the recovery of exemplary (punitive) damages under Texas Civil Practice and Remedies Code § 41.003; *see Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994) (gross negligence is not an independent tort but a threshold for punitive damages in negligence actions). Plaintiffs' first amended petition does not allege a viable underlying negligence claim that would support an award of exemplary damages, nor does it plead facts showing an extreme degree of risk and Defendants' subjective awareness of and conscious indifference to that risk, as required by *Moriel* and Tex. Civ. Prac. Rem. Code § 41.001(11). Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to replead with specificity or clarify that their gross negligence allegations are asserted solely in support of exemplary damages and not as an independent cause of action. If they cannot do so, the claim should be dismissed. Plaintiffs' first amended petition offers only conclusory statements and fails to plead facts showing Defendants

had actual, subjective awareness of any extreme risk or consciously disregarded it. Mere allegations of negligence, even if repeated, are insufficient to support a gross negligence claim. Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to replead their gross negligence claim with sufficient specificity. If they are unable or unwilling to do so, the claim should be dismissed.

**8)** **Negligent Activity Claims (Count 4).** Defendants specially except to Plaintiffs' negligent activity claim because it fails to plead facts sufficient to state a legally viable cause of action. Under Texas law, a negligent activity theory requires that the plaintiff's injuries arise from a contemporaneous, ongoing activity by the defendant—not from a static condition. *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992). Plaintiffs do not identify any specific ongoing activity by Defendants that caused the alleged harm. Without factual allegations showing a duty, breach, and proximate cause tied to an active occurrence, the claim is deficient. Defendants request that the Court sustain this special exception and require Plaintiffs to replead with specificity or, if they cannot, dismiss the claim.

**9)** **Respondeat Superior (Count 5)**. Defendants specially except to Plaintiffs' respondeat superior claims. Plaintiff improperly pleads "respondeat superior" as a separate cause of action. Texas law is clear that respondeat superior is not an independent tort but a theory of vicarious liability that attaches to an underlying actionable wrong committed by an employee within the course and scope of employment. Further, Plaintiffs fail to plead with specificity any actionable tort or wrongful conduct by an employee for which Defendant could be held vicariously liable. Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to replead their "respondeat superior" claim with sufficient specificity. If they are unable or unwilling to do so, the claim should be dismissed.

10)    **Breach of Contract. (Count 8).** Plaintiff has failed to plead the contractual provision allegedly breached and the manner in which Defendants' conduct constitutes a breach of the contract, and has failed to plead sufficient terms of the alleged agreement to allow Defendants to ascertain the obligations at issue. Vague references to an unspecified agreement are insufficient to state a cause of action. *See Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 786 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to replead their breach of contract claim with sufficient specificity. If they are unable or unwilling to do so, the claim should be dismissed.

11)    **Breach of Contract Damages (Count 8).** Plaintiff's first amended petition does not plead facts supporting recoverable damages caused by the alleged breach of contract. Merely asserting "damages" in a conclusory fashion does not meet pleading requirements. Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to replead their breach of contract damages with sufficient specificity. If they are unable or unwilling to do so, the claim should be dismissed.

1. **Plaintiff fails to identify which contractual provision was breached (Count 8).** Plaintiff's petition is vague and does not identify any specific contractual term that Defendant allegedly breached. Without such specificity, Defendant cannot prepare an adequate response or defense, including rebuttal of causation and damages.
2. **Breach of Contract Causation (Count 8).** Plaintiff alleges that Defendant breached a contract but fails to allege facts demonstrating a direct causal link between any alleged breach and the damages claimed. Texas law requires that a plaintiff seeking damages for breach of contract must allege facts showing that the alleged breach proximately caused the damages claimed.

12)    **Fraud (Count 9).** Defendants specially except to Plaintiffs' fraud claim because it is conclusory, improperly duplicative of their breach of contract claim, and fails to allege any independent injury as required under Texas law. Under Texas law, a plaintiff may not repackage

a breach of contract claim as fraud merely by asserting that the breach was made with fraudulent intent. To be viable, a fraud claim must allege a duty independent of the contract and a distinct injury that is not merely the loss of contractual benefits. Here, Plaintiffs' fraud allegations are not pleaded with particularity, as required by Rule 45 of the Texas Rules of Civil Procedure. Plaintiffs fail to specify the alleged misrepresentations, when and by whom they were made, and how they caused a separate injury beyond the alleged breach. The alleged injury appears to be identical to the claimed contractual loss, which is insufficient to support a separate tort theory. Accordingly, Defendants request that the Court sustain this special exception and order Plaintiffs to amend their first amended petition to:

1. Plead the elements of fraud with particularity, including the specific statements made, by whom, when, and how they were false;

2. Identify a legal duty independent of the contract;

3. Allege an injury that is distinct from the breach of contract itself.

If Plaintiffs are unable to replead to meet these requirements, Defendants respectfully request that the Court strike or dismiss the fraud claim.

**13) Fraudulent Inducement Claims (Count 10).** Fraudulent inducement is subject to the same heightened pleading standards as common law fraud. Plaintiffs must identify who made the alleged misrepresentation, what was said, when and where it was said, and why it was false at the time. Here, Plaintiffs fail to plead the elements of fraudulent inducement with sufficient specificity. The allegations do not specify the particular misrepresentations or facts that demonstrate the defendant never intended to fulfill the promise at the time it was made. Further, to the extent Plaintiffs seek only the benefit of their contractual bargain, they have not alleged an independent injury separate from their breach of contract claim. Under Texas law, a fraud claim cannot proceed when it merely duplicates a contract claim without a distinct injury. Accordingly,

Defendants respectfully request that the Court sustain this special exception and order Plaintiffs to amend their first amended petition to:

1. Plead fraudulent inducement with particularity, including the who, what, when, where, and how of the alleged misrepresentation;
2. Identify an injury independent of the alleged breach of contract.

**14)    Civil Conspiracy (Count 11).** Defendants specially except to Plaintiffs' civil conspiracy claim to the extent it is based on alleged coordination between a private business and its employees. Under Texas law, a corporation or business entity cannot conspire with its own employees, officers, or agents when they are acting within the course and scope of their employment. Plaintiffs have not alleged that any employees were acting outside the scope of their employment or that they were pursuing purely personal interests adverse to the business. Absent such allegations, the conspiracy claim is legally defective. Accordingly, Defendants respectfully request that the Court sustain this special exception and require Plaintiffs to replead their civil conspiracy claim, if they can do so in compliance with Texas law. If Plaintiffs cannot cure this defect, the conspiracy claim should be dismissed.

**15)    Failure to Plead Elements of Damages.** Plaintiffs allege that they have collectively suffered damages as a result of Defendants' actions (**Exhibit B** at 18-19) but fail to specifically plead:

- The nature and amount of damages claimed;

- How the damages were caused by Defendant's alleged conduct; and

- Any supporting factual allegations linking Defendant's conduct to the claimed damages.

Plaintiffs' amended petition contains only general statements of damages without specifying actual losses, economic or non-economic, or the factual basis for those claims. Plaintiffs

do not differentiate between damages allegedly arising from breach of contract and those allegedly arising from tort claims. Texas law recognizes distinct limitations and measures of recovery for contract and tort claims. Plaintiff's failure to distinguish between these damages leaves Defendants unable to ascertain which damages are claimed under which legal theory, or to respond appropriately. Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to amend their pleading to identify the factual basis for their request. If Plaintiffs are unable to do so, the request should be stricken from the first amended petition.

**16)    Attorney's Fees.** Defendants specially except to Plaintiffs' request for attorney's fees because the first amended petition fails to identify any statute or contract provision that would entitle them to recover such fees. *See* **Exhibit B** at 15. Under Texas law, attorney's fees are recoverable only when authorized by statute or by contract. A general request for attorney's fees, without identifying the specific statutory or contractual basis, does not provide fair notice and is legally insufficient. Accordingly, Defendants request that the Court sustain this special exception and require Plaintiffs to amend their pleading to identify the legal basis for their request. If Plaintiffs are unable to do so, the request should be stricken from the first amended petition.

## **GENERAL DENIAL**

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendant generally denies every allegation contained in Plaintiffs' first amended petition and demands strict proof thereof as required by the Constitution and laws of the State of Texas.

By way of further answer, Defendants hereby give actual notice to Plaintiffs that all documents produced by Plaintiffs during discovery may be used against Plaintiffs at any pre-trial proceeding and/or trial of this matter without the necessity of authenticating the document. This notice is given according to Rule 193.7 of the Texas Rules of Civil Procedure.

## AFFIRMATIVE DEFENSES

Without waiving the foregoing general denial, Defendants assert the following affirmative and other defenses:

1. **Jury Waiver**: The parties have expressly and mutually agreed, as set forth in the executed contract, to waive their right to a trial by jury.

2. **Failure to State A Claim for "Retaliation"**: No private right of action exists for retaliation under the Texas statutes and regulations governing childcare facilities and daycare operations. Texas law vests enforcement authority for childcare licensing statutes exclusively with the Texas Health and Human Services Commission/Department of Family and Protective Services. Because the Legislature has not created a private cause of action for retaliation in this context, Plaintiff lacks a cognizable legal basis to assert such a claim against Defendant.

3. **Failure to State a Claim and No Private Right of Action for Failure to Accommodate**: Texas statutes and regulations governing childcare and daycare facilities do not provide a private cause of action for alleged failures to accommodate. Because the Legislature has not created a private cause of action for such claims in this context, Plaintiff lacks standing and a cognizable legal basis to assert this claim against Defendants.

4. **Failure to State a Claim for the Practice of Medicine (Statutory Exclusion)**: TEX. OCC. CODE § 151.002(a)(13) defines the "practice of medicine" narrowly, including diagnosing, treating, or offering to treat a physical or mental condition by any system or method. Defendants, individually or collectively, did not diagnose, prescribe, or treat any condition, nor did they hold themselves out as qualified to do so. Mere involvement in educational, supportive, clerical, or administrative roles does not constitute the "practice of medicine."

5.      **Lack of Standing (Unauthorized Practice of Medicine Claim)**: Plaintiffs lack standing to assert any claim premised upon the alleged unauthorized practice of medicine under Texas law. The Texas Occupations Code vests exclusive authority to investigate and enforce matters involving the unauthorized practice of medicine in the Texas Medical Board and other designated regulatory authorities. *See* TEX. OCC. CODE §§ 155.001, 165.151, et seq. Texas courts have consistently held that there is no private right of action for alleged violations of these provisions. Accordingly, Plaintiffs cannot establish standing to pursue such a claim, and any cause of action based upon alleged unauthorized practice of medicine fails as a matter of law.

6.      **Failure to State a Claim for Civil Conspiracy**: Plaintiffs' conspiracy claims are barred by the intracorporate conspiracy doctrine.

7.      **Failure to State a Claim for Fraud or Fraudulent Inducement**: Plaintiffs' claims for fraud and/or fraudulent inducement fail to state a claim upon which relief may be granted under Texas law. Plaintiffs have not alleged with the requisite specificity the elements of fraud, including the existence of a material misrepresentation, falsity, intent, justifiable reliance, and damages. In addition, Plaintiffs have failed to plead the circumstances of any alleged fraud with particularity as required by Texas law. Accordingly, Plaintiffs' fraud-based claims are insufficient as a matter of law.

8.      **No Independent Cause of Action for Failure to Train or Supervise**: Defendants assert that Plaintiffs' claim for "failure to train or supervise" fails as a matter of law. Texas does not recognize negligent training or supervision as an independent cause of action, absent an underlying actionable tort by an employee. To the extent Plaintiffs have failed to plead or cannot prove an underlying tort committed by Defendants' employee(s), any claim for negligent training

14

or supervision is barred as a matter of law. Accordingly, Plaintiffs' allegations of negligent training or supervision fail to state a claim upon which relief may be granted.

9.      **No Breach of Contract**: Defendants assert that, at all relevant times, they fully performed all obligations required under the contract with Plaintiffs. Any alleged damages or dissatisfaction asserted by Plaintiffs arise from Plaintiffs' own actions, assumptions, or misinterpretations, and not from any failure, neglect, or breach by Defendants.

10.     **Failure to State a Claim for Breach of Contract**: Defendants assert that, even if the Court assumes, arguendo, that a contract existed, Plaintiffs have failed to allege facts sufficient to establish a breach. Specifically:

1.      **Failure to Allege Breach of Any Contractual Provision:** Plaintiffs have not identified any specific provision of the contract that Defendants allegedly breached.

2.      **Failure to Plead Damages:** Plaintiffs have not demonstrated that any actual damages were incurred as a direct result of Defendants' alleged conduct.

3.      **Failure to Establish Causation:** Plaintiffs have not pled facts showing a causal connection between any alleged breach by Defendants and the purported harm. Any alleged injuries or losses may have arisen from independent actions of Plaintiffs or third parties, rather than from any act or omission by Defendants.

11.     **Accord and Satisfaction**. The parties agreed to accept different performance in satisfaction of the contract.

12.     **Waiver or Estoppel**: Plaintiffs waived rights or are estopped from asserting the claim due to their own conduct.

13.     **Frustration of Purpose**: The principal purpose of the contract was substantially frustrated by events not caused by Defendants.

14.     **Economic Loss Rule**: Defendants assert the **economic loss rule**. Plaintiffs' claims are barred, in whole or in part, because they improperly seek recovery in tort for purely economic damages arising solely from alleged contractual duties. Under Texas law, a plaintiff may not recover in tort for economic losses that are only the subject matter of a contract. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235 (Tex. 2014). Here, Plaintiffs' alleged damages are economic in nature and flow only from the alleged breach of contractual obligations. Because Plaintiffs have not alleged or cannot prove any independent duty recognized by Texas law, beyond the duties imposed by contract, Plaintiffs' tort-based claims are barred.

15.     **Parol Evidence Rule**: Defendants assert, as an affirmative defense, that any alleged oral or written agreements, statements, or representations made before or contemporaneous with the execution of the written contract are barred by the parole evidence rule. The written contract between the parties constitutes the complete and final agreement, and no evidence of prior or contemporaneous agreements may be introduced to vary, alter, or contradict its terms.

16.     **Damages-Contract Claims**: To the extent Plaintiffs seek damages for breach of contract, their recovery, if any, is limited to the benefit of the bargain and direct economic damages. Plaintiffs are not entitled to recover mental anguish, pain and suffering, loss of enjoyment of life, or other non-economic damages in connection with a contract claim. *See Reed*, 711 S.W.2d at 618–19.

17.     **Treble Damages Not Available:** Defendants assert that Plaintiffs' demand for treble damages is improper and unavailable as a matter of law. Treble damages are only authorized under limited statutory schemes, such as the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), TEX. BUS. & COM. CODE § 17.50(b)(1), or other expressly enumerated

statutes. Plaintiffs have not pleaded any claim under the DTPA or any other statute that permits treble damages. Accordingly, Plaintiffs' request for treble damages fails to state a claim for relief and is barred.

18.     **Medical Expenses – Paid or Incurred Rule**: Any claim for medical expenses is limited to the amount actually paid or incurred by or on behalf of Plaintiffs, as provided by TEX. CIV. PRAC. & REM. CODE § 41.0105.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants request judgment of this Court that Plaintiffs take nothing by this suit; that Plaintiffs' claims be dismissed with prejudice, and that Defendants recover their attorneys' fees and costs, together with such other and further relief to which they may be justly entitled.

Respectfully submitted,

**SCHULMAN, LOPEZ, HOFFER & ADELSTEIN, LLP**

Travis Building
9011 Mountain Ridge Dr., Suite 210
Austin, Texas 78759
Telephone: 512-840-0022
Facsimile: 210-538-5384

By: */s/ Christopher Schulz*
CHRISTOPHER SCHULZ
State Bar No. 24060576
Email: cshulz@slh-law.com
ELIZABETH ANGELONE
State Bar No. 24077349
Email: eanglone@slh-law.com

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2025, the foregoing was e-filed with the Clerk of the

Court and a copy will be sent via e-service to the attorney of record for Plaintiffs, namely:

Amy C. Welborn
**WELBORN LAW LLC**
8712 Mesa Suite B206
Austin, Texas 78759
amy@welborn-law.com

*/s/ Christopher Schulz*
Attorney for Defendants

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ROSS PONDER and SARAH PONDER, | § | |
| *Individually, and as Next Friend of* LY, | § | |
| AND AS NEXT FRIEND H.P., L.P., and | § | |
| R.P., *Minors*, | § | |
| *Plaintiffs* | § | |
| v. | § | No. 1:25-Cv-00615-ADA-SH |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC., | § | |
| RONALD GRAE BAKER, and | § | |
| JINNY GONZALEZ, | § | |
| *Defendants* | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE ALAN D ALBRIGHT
    UNITED STATES DISTRICT JUDGE

Now before the Court is Plaintiffs' Unopposed First Amended Motion to Remand (Dkt. 23),

filed June 11, 2025.[1]

## I.    Background

After Plaintiffs Ross and Sarah Ponder's children were expelled from the Austin Montessori

School in Austin, Texas, they filed this suit in state court, alleging negligence, negligence *per se*,

gross negligence, *respondeat superior*, breach of contract, fraud, fraudulent inducement, civil

conspiracy, and violations of Title III of the Americans with Disabilities Act ("ADA") and Section

504 of the Rehabilitation Act. *See Ponder v. AMS*, No. D-1-GN-25-002212 (345th Dist. Ct., Travis

County, Tex. March 28, 2025); Plaintiffs' Original Petition, Dkt. 1-3 at 7-33. Defendants removed,

invoking this Court's federal question jurisdiction based on Plaintiffs' federal claims under the

---

[1] The District Court referred this case to this Magistrate Judge for disposition of non-dispositive motions and a report and recommendation on dispositive motions, pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72, Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, and the District Court's Standing Order. Dkt. 2.

ADA and the Rehabilitation Act, pursuant to 28 U.S.C. §§ 1441(a) and 1446. Dkt. 1. Plaintiffs then filed a First Amended Complaint removing all federal claims (Dkt. 22) and this unopposed motion to remand this action to state court under 28 U.S.C. § 1447.

## II.    Legal Standard

Federal courts are courts of limited jurisdiction and "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). Congress has granted jurisdiction over two general types of cases: those arising under federal law ("federal question jurisdiction"), and those in which the amount in controversy exceeds $75,000 and there is complete diversity of citizenship among the parties ("diversity jurisdiction"). 28 U.S.C. §§ 1331, 1332(a); *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 437-38 (2019). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377.

The federal removal statute allows a defendant to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). Once a defendant removes an action from state to federal court, the plaintiff may move to remand. 28 U.S.C. § 1447(c). A court must remand a case "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction over a case removed from state court." *Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 87 (1991) (quoting 28 U.S.C. § 1447(c)).

## III.    Analysis

Plaintiffs move to remand this action to state court under 28 U.S.C. § 1447(c) because the amended petition contains only state law claims. Dkt. 23 at 5. Defendants agree that this action should be remanded to state court. *Id.*

2

> If a complaint filed in state court asserts federal-law claims, the
> defendant may remove the case to federal court. And if the
> complaint also asserts state-law claims arising out of the same facts,
> the federal court may adjudicate those claims too, in the exercise of
> what is called supplemental jurisdiction.

*Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 25 (2025). Because Plaintiffs' Original

Petition asserted both state and federal claims, Defendants properly removed this case to federal

court under 28 U.S.C. § 1441(a), and the Court had subject matter jurisdiction over Plaintiffs'

federal claims and supplemental jurisdiction over Plaintiffs' state claims at that time. *Id.* But after

removal, Plaintiffs removed all federal claims, leaving only claims under state law, so the Court

no longer has subject matter jurisdiction. "When an amendment excises the federal-law claims that

enabled removal, the federal court loses its supplemental jurisdiction over the related state-law

claims," and the case must return to state court. *Id.*

## IV.    Recommendation

For these reasons, this Magistrate Judge **RECOMMENDS** that the District Court **GRANT**

Plaintiffs' Unopposed First Amended Motion to Remand (Dkt. 23) and **REMAND** this action to

the 345th Judicial District of Travis County, Texas.

## V.    Warnings

The parties may file objections to this Report and Recommendation. A party filing objections

must specifically identify those findings or recommendations to which objections are being made.

The District Court need not consider frivolous, conclusive, or general objections. *See Battle v.*

*United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written

objections to the proposed findings and recommendations contained in this Report within 14 days

after the party is served with a copy of the Report shall bar that party from de novo review by the

District Court of the proposed findings and recommendations in the Report and, except on grounds

of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings

3

and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on July 14, 2025.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISON

| | | |
|---|---|---|
| ROSS PONDER AND SARAH PONDER, | § | |
| INDIVIDUALLY, AND AS NEXT FRIEND | § | |
| OF H.P., L.P., and R.P., MINORS, | § | |
|     Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:25-cv-00615 ADA-SH |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC.; | § | |
| RONALD GRAE BAKER, INDIVIDUALLY; | § | |
| and JINNY GONZALEZ, INDIVIDUALLY, | § | |
|     Defendants. | § | |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, Ross Ponder and Sarah Ponder, Individually and as Next Friend of H.P., L.P. and R.P., minors ("Ponders" or "Plaintiff"), file their First Amended Complaint against Defendant Austin Montessori School, Inc.("AMS"), Grae Baker ("Baker"), and Jinny Gonzalez ("Gonzalez") (collectively "Defendants") and show the Court as follows:

### I. PARTIES

1.      Plaintiffs Ross and Sarah Ponder are the parents of Plaintiff H.P., L.P., and R.P., minors.  Plaintiffs reside in Travis County, Texas.

2.      Defendant Austin Montessori School, Inc. is a Texas corporation with its principal place of business at 5006 Sunset Trail, Austin, Texas 78745.  Defendant AMS has previously answered and accepted service.

3.      Defendant Ronald Grae Baker is an individual that resides at 10521 Redmond Road, Austin, Texas 78739. Defendant Baker has previously answered and accepted service.

4.      Defendant Jinny Gonzalez is an individual that resides at 2907 Pops Way, Austin, Texas 78745.  Defendant Gonzalez has previously answered and accepted service.

## II. JURISDICTION

5.     Subject matter jurisdiction is improper in Federal Court because all the claims are based in Texas law and no Federal claims exist.  Jurisdiction is proper in Travis County District Court.

## III. SUMMARY

6.     The Ponders fully embraced Montessori practices and were excited to have enrolled their children at AMS.  Unfortunately, after enrolling the children, the Ponders learned that AMS does not follow many of the practices of Dr. Maria Montessori and her traditional method, instead using their own practices, which were very harmful to the Ponder children.

7.     Montessori guides are trained to "follow the child" by emphasizing self-directed learning and movement within a prepared environment. Montessori education principles involve the use of collaboration with the parents to create a support plan to best support each child.  Montessori education emphasizes discipline through positive guidance and self-regulation, rather than punishment.

8.     At critical points, Defendants did not collaborate with the Ponders and intentionally prevented information from being shared with parents. Defendants utilized questionable and inappropriate punishments.

9.     Defendants also did not disclose that they adopted their own form of quack medicine used to diagnose and treat their students, in violation of state laws and in opposition of standard medical practices.

10.    AMS fraudulently induced the Ponders into contracts.  When the Ponders questioned the practices of AMS, the children were expelled.

11.    Further, AMS allowed and supported Gonzalez, the Director of Early Childhood Programs, to practice medicine without a license, allowing her to make diagnoses of children, knowing she

had no medical training. Gonzalez "diagnosed" and treated H.P. for "an underdeveloped will." Her prescribed 'treatment plan' included: controlling family medical routines, isolation therapy, dictating parent-child communication, rigid behavioral modification schedules, and specific therapeutic interventions.

12.     To prevent exposure of AMS's quack medical and other practices, AMS refused to provide important information to the parents of the children attending AMS and prevented meaningful parent communication with staff, including information regarding incidents and specifics of the medical treatment. AMS failed to allow the Ponders access to medical, school and treatment records in violation of state law.

13.     The Ponders were repeatedly called to pick up H.P. and/or R.P. without notice and frequently without detailed information regarding an alleged incident.

14.     Upon questioning AMS's quack medicine and lack of communication and bringing these issues to the attention of other family members at AMS and the Texas Health and Human Services, AMS retaliated by expelling the Ponder children.

## IV. FACTS

15.     The Ponders first enrolled at AMS in August of 2023. The Ponder children had previously thrived in another Montessori environment. The Ponders believed AMS would provide a nurturing supportive environment for their children in keeping with Dr. Montessori's teachings.

16.     The Ponders' enrollment contracts were for an 8 am-3:15 school day (full-time) for all of their children. During the 2023-2024 school year, H.P. and L.P. attended AMS at a cost of $40,555. During the 2024-2025 school year, R.P., H.P., and L.P. attended AMS at a cost of $57,973.50.   Attached as Exhibit 1 is a redacted (public version) of a contract for H.P.

17.     The Ponders were required to remain under contract when two children's hours were

reduced.  The reduction in the amount of tuition was minimal (about $3000 a year) and the cost for other care to replace the contracted care was significant, causing financial burden.

18.     H.P.'s first day at AMS was August 17, 2023.   AMS noted that there were no issues when H.P. napped.  On or about August 29, 2023, the Ponders were informed that their son, H.P. was having issues sleeping during nap time.  A meeting was immediately held the same day to address the matter.

19.     On Thursday, August 31, 2023, AMS informed the Ponders that H.P. would need to be picked up starting at noon each day.  The Ponders were told this was a transition period to allow H.P. to get used to AMS. The Ponders were given no alternatives.  The Ponders specifically chose AMS because it allowed for full day coverage for all their children.

20.     AMS did not offer to let the Ponders out of their contract.  The Ponders were strapped into a contract for full-time care but were receiving two to three hours of care.

21.      On Friday, September 8, 2023, Gonzalez emailed the Ponders to request a meeting regarding H.P.'s "dysregulation."  The Ponders were told that H.P. was not allowed to return to the school until after the meeting occurred on September 11, 2023, meaning the Ponders had to arrange childcare for H.P. so that they could attend the meeting.

22.     At the September 11, 2023, meeting, AMS stated that they "interpret behavior differently from the normative."   Ms. Gonzalez diagnosed H.P. with "undeveloped will" and provided her medical treatment plan. The medical treatment plan required that the Ponders follow a specific routine, recommending that they "modify the time each family member goes to bed and wakes up."  The treatment plan instituted rules for speaking to H.P.  The treatment plan forbade the Ponders from walking to school and required that H.P. arrive by car at exactly 8 am daily.

4

23.     Ms. Gonzales informed the Ponders that H.P. would only be allowed to attend school until 10 am, until the next treatment meeting in two weeks.  During this two-week period, Gonzalez and AMS would treat H.P.'s condition and Gonzalez would determine if H.P. made medical progress in his treatment that would allow H.P. to attend until noon, not the contracted 3:15 pm.  They required that the school counselor Leslie Grove observe H.P.  Gonzalez stated that the treatment plan would "break the habit" of H.P. being in distress.   Gonzalez also demanded that the Ponders always keep their phones on to accommodate immediate pickups when AMS required it.

24.     On September 12, 2023, Leslie Grove notified the Ponders that she would observe H.P. on September 18, 2023, and that she wanted to schedule a conference to discuss H.P. with the Ponders.  This was scheduled for September 27, 2023.

25.     On September 15, 2023, the Ponders requested an update on H.P. and asked if he could gradually leave a little later.  Gonzalez informed the Ponders that this would not be an option.

26.     Another meeting was scheduled on Thursday, September 21, 2023 to discuss the progress of H.P.'s medical treatment.  However, on September 21, 2023, Jinny Gonzalez emailed the Ponders stating that AMS had to cancel the meeting due to being very busy.  They agreed to reschedule the meeting to September 26, 2023, and to move the pick-up time for H.P. the following week to allow him to stay until 10 am on Monday and Tuesday, 10:30 am on Wednesday and Thursday and 11 am on Friday.

27.     On October 2, 2023, Lesley Williams, H.P.'s teacher, informed the Ponders that H.P. had been improving and had "the best day at school so far."  There was no concern that he had behavioral issues that the school could not address. His time at the school was extended to noon each day.

28.     Gonzalez's treatment included hiring an occupational therapist to work with H.P. At the

5

recommendation of Jinny Gonzalez, the Ponders hired Jennie Buckley but later determined she was not an occupational therapist. Further, she recommended unnecessary therapy, such as vision therapy. This caused a delay in getting H.P. an OT evaluation.

29.     On December 20, 2023, Leslie Grove, the school psychologist, observed H.P. and found that he was doing very well. She noted that she would not be connecting with AMS administration until late January to discuss her findings. Regardless, and without waiting for their own psychologist's assessment, on January 5, 2024, Jinny Gonzalez instructed that H.P. no longer be allowed at the school past 11 a.m. Again, the contractual terms and payments were for full day coverage, not a two- or three-hour drop off. The school informed them that they had additional new children and due to accommodating them, they would need to pick up H.P. early each day until AMS was able to adapt to the new students.

30.     On January 23, 2024, AMS informed the Ponders that they were "changing things" and would not accommodate H.P. attending for more than a few hours each day at that time.

31.     On January 31, 2024, Ross Ponder's brother became ill and died March 5, 2024. AMS denied a request to allow H.P. to stay when Ross had to leave town before his brother's life support was pulled and was unable to pick him up at 11:45 am.

32.      H.P. had his initial OT evaluation on April 26, 2024. The school agreed to meet and discuss on May 17, 2024. At the May 17, 2024, meeting, the Ponders reported on the OT evaluation. The Ponders requested that H.P. be transitioned to extended day, as they had contracted for full-time school. The school refused to allow H.P. to go full-time in June and stated that they would need to wait for an evaluation in July when his teacher returned from vacation. It was evident that the school had staffing issues that needed to be addressed.

33.     On July 2, 2024, immediately upon her return from vacation, Ms. Williams, H.P.'s teacher,

communicated with the Ponders and stated that H.P.'s day should be extended to 12:30 pm.

34. By July 30, 2024, it was becoming more evident that AMS had serious staffing issues. Jinny Gonzalez sent multiple communications to all the families at AMS notifying them of staffing changes. While the plan was for H.P. to begin transitioning to full day school, AMS continued to ask for him to be picked up early. Additionally, AMS began requiring that R.P. to also be picked up early. Further, according to AMS staff, at times there were as many as 39 children in the nap program called Casita.

35. The teachers/Guides were clearly working without enough support and even disclosed their stresses and personal medical information regarding hormonal changes to the children through discussions highly abnormal and inappropriate to have with young students.

36. While Montessori teachings allow students to be given guidance and redirection, they do not punish. However, AMS allowed the stressed teachers to punish children and classes. Access to water bottles were restricted to an entire class as a punishment and students were encouraged to go into the bathroom often without the lights on, as a normalized way of isolating children from the classroom for being "too loud."

37. On September 11, 2024, the Ponders notified the school that the family's beloved dog was actively dying of cancer and would likely die in the next 1-3 days.

38. On September 12, 2024, Jinny Gonzalez again provided notice to all the families of staffing concerns.

39. On September 12, 2024, an AMS administrator called the Ponders at noon, stating that the youngest Ponder child, R.P., would need to be picked up early because she was not sleeping in Casita, something that had not previously been disclosed and was not a problem before or after R.P.'s time at AMS The Ponders were dealing with a different emergency in their home–the death

of their terminally ill German shepherd and desire to remove the animal's body prior to the children returning home.  AMS was unwilling to provide any concession regarding their demand to pick up regardless of what the family was managing at the home that day.

40.     On September 13, 2024, AMS again requested that both children be picked up early.  Again, there were significant staffing issues at AMS.

41.      On November 22, 2024, Jinny Gonzalez scheduled a meeting regarding H.P.'s progress under her medical treatment plan for December 5, 2024.  The Ponders informed AMS that H.P. would be going to the doctor to determine if he had ADHD, which directly conflicted with Ms. Gonzalez's treatment plan and diagnosis.

42.     On December 3, 2024, H.P. was formally diagnosed with ADHD.  The Ponders provided the diagnosis and medical documentation to AMS immediately.

43.     On December 5, 2024, at the scheduled meeting to discuss H.P.'s progress and accommodations, Jinny Gonzalez stated that she did not think that AMS was the right school for H.P.  Ms. Gonzalez stated that she did not believe in diagnosing or medicating a child for ADHD and did not approve of the treatment plan from H.P.'s actual physician.  In fact, with the support of AMS, Gonzalez specifically discussed her own medical plan, stating the need to override the diagnosis of an actual doctor.  AMS shortened H.P.'s days to half days.

44.     On December 7, 2024, H.P. was started on ADHD medication, which had very positive effects.  The Ponders requested that H.P. receive new evaluations by AMS to determine the effects of the new medication, which they had found effective at home.

45.     On December 16, 2024, the Ponders met with Baker and School Advisor, Jeff Schneider.  Mr. Baker agreed to delay enrollment decisions for H.P. until the middle of the spring semester and to provide regular updates about how H.P. was performing in school, including the response

to medication.

46.     However, from December 16, 2024, to January 27, 2025, AMS refused to provide feedback. The Ponders made repeated requests to meet to discuss H.P. and requested that Gonzalez be taken off the team, due to her alternative medical diagnosis and treatment and disregard of H.P.'s licensed pediatrician and faculty member at Dell Medical School.

47.     On January 17, 2025, Baker sent correspondence stating that AMS would not be offering an enrollment contract for the following year to H.P. Mr. Baker also chastised the Ponders for requesting that Gonzalez be removed from H.P.'s case, stating AMS's support for Gonzalez and her quack medicine, dismissing the parent and pediatrician input and advice.

48.     On January 24, 2025, the Ponders met with Mr. Baker and Mr. Schneider. The Ponders highlighted communication issues, the lack of communications with parents and the systematic barriers that prevented parents from being informed of concerns regarding their children, noting many parents shared these concerns. Mr. Baker informed them in this meeting that not only was H.P. not allowed to return next semester, that AMS was expelling H.P. on February 7, 2025.

49.     On January 24, 2025, the Ponders filed a complaint with the Texas Health and Human Services based on their experiences and after reviewing AMS's most recent HHS inspection in October 2024, which recorded deficiencies in recordkeeping, naptime, and operational policies regarding suspension and expulsion. The Ponders also requested to receive copies of these relevant records and policies but were denied by AMS. The fact that this complaint was filed was made known to AMS on January 25, 2025.

50.     On January 28, 2025, Baker emailed to inform the Ponders that all the Ponder children would be expelled if the Ponders did not follow the demands of AMS, including following the medical treatment plan created by Gonzalez.

51.     The same day, the Ponders informed the other school parents of the ongoing issues in a WhatsApp post, in an effort to make changes intended to help all students gain community support and raise concerns.  The WhatsApp group was a private, optional, parent-run platform that was not associated with the school administration and with a minor fraction of the school's parents actively participating.  The school had no right to limit speech in this forum or have an opinion about a forum not inclusive of the school or faculty.  This would be akin to the school trying to limit conversations between parents in a home, church or any other off property location.

52.     On January 29, 2025, the Ponders received H.P.'s initial evaluation from Austin ISD.  AISD determined that H.P. would be placed in a standard classroom with minor accommodations and did not need a special education classroom, occupational, speech, or vision therapy. The results were immediately distributed to AMS and the Ponders requested a meeting.

53.     On January 30, 2025, Baker sent a letter to all parents, guardians, and staff at AMS stating that the information provided by the Ponders was "misleading" and that "false claims" were made.  The statements made were derogatory and caused the Ponders financial harm.  The decision to expel all three children was made on or before the same day.

54.     A coffee was held at 8:30 AM on January 31, 2025, at the Ponders' home to further discuss systematic communication issues affecting many students at AMS. At 5:45 PM on January 31, 2025, AMS terminated the enrollment of all three children.  It was stated by AMS that the terminations occurred because the Ponder parents' "actions were detrimental to the school."  Clearly the actions referred to are the filing of the HHS complaint and reaching out to other parents to discuss the communication concerns.  The termination of the Ponder children was retaliation.

55.     The impact on the family has been extreme.  While attending the school, the quack

10

medicine diagnosis and treatment plan instituted by Gonzalez caused H.P. harm.

56.     H.P. has suffered extreme anxiety, mental anguish and distress at the hands of AMS.  The level of torture he experienced was not understood until he was placed in a new school, where he is thriving.  The Montessori teaching is to provide peaceful development, particularly from ages three to six, something that AMS did not provide the Ponder children.

57.     The malicious punishments and unreasonable demands made of H.P. and the Ponders caused chaos, anxiety, and disruption of the entire family.  The Ponders' entire lives were dismantled, as the school would call with less than 15 minutes notice and demand that a child be picked up. They were no longer allowed to follow their chosen morning routine.

58.     Further, the Ponders were forced to spend thousands of dollars on treatments that Gonzalez prescribed to treat her diagnosis of  H.P. with "underdeveloped will." These treatments were not necessary or beneficial to treat H.P.

59.     Due to the change in hours, the Ponders ability to work full-time was severely impacted, clearly impacting their earning abilities.

60.     Sarah Ponder's career was damaged by the actions of Defendants. Some of her clients received the letter, causing at least one to terminate the relationship.

61.     The expulsion and the entire AMS experience caused extreme mental anguish for the entire family.  The Ponder children have faced severe emotional distress in having to change schools. They were not able to be immediately placed in school, causing educational disruption.

**V. CAUSES OF ACTION**

**A. Count 1- Negligence**

62.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

63.     The occurrences made the basis of this suit, and the resulting injuries and damages of the

11

Plaintiffs were proximately caused by the negligent conduct of the Defendants. Defendants were negligent by breaching the duty that was owed to the Plaintiffs, to exercise ordinary care in one or more of the following acts or omissions, constituting negligence:

> a. Failing to exercise the care necessary under the circumstances;
>
> b. Failing to do what a reasonable daycare would have done under the circumstances;
>
> c. Failing to intervene to ensure a child's safety;
>
> d. Failing to provide proper supervision;
>
> e. Failing to properly hire, qualify, train and supervise its employees;
>
> f. Failing to provide reasonable accommodations; and
>
> g. Failing to adhere to the Texas Minimum standards for childcare.

64.     Defendants had a duty to exercise ordinary care in caring for and supervising the children in its care so as to prevent injury to Plaintiffs H.P., R.P. and L. P.

65.     Defendants had a duty to maintain a safe environment for children in its care.

66.     Defendants had a duty to hire, train, and supervise caregiver employees to ensure children were not subjected to inappropriate medical treatments or action plans and to prevent injury to Plaintiffs and other children similarly situated.

67.     Defendants breached the duty of care by failing to care for the children, failing to supervise the children, failing to use positive methods of discipline, failing to stop discrimination, failing to provide accommodations, and failing to properly train, hire, and supervise its employees.

68.     Defendants' negligent acts and/or omissions, and breach of duties, directly and proximately caused injury to Plaintiffs, which resulted in significant damages.

**B. Count 2- Negligence Per Se**

69.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

70.    Defendants failed to exercise the mandatory standard of care in violation of the minimum standards for childcare.

71.    Texas law requires that discipline be positive and encourage self-esteem, self-control, and self-direction. 26 TAC 744.501. Refusal to provide water and putting children in dark bathrooms is not appropriate punishment.

72.    AMS failed to encourage the Ponder children to express feelings and failed to give appropriate attention.  26TAC 746.2601 When H.P. was upset or speaking loudly he was sent to a bathroom, sometimes without lights on.

73.    AMS failed to comply with the regulations regarding nap times and food service for H.P.  26 TAC Sec. 746.2901-2911; 26 TAC Sec. 746.3301-3321. H.P. and R.P. were forced to nap for more than an hour.   H.P. was not allowed to have unhurried meals.

74.  Under Tex. Occ. Code §§ 151.002(13), 165.152, any person who diagnoses or treats a physical or mental condition without a license commits a statutory violation. By diagnosing H.P. to have an "underdeveloped will," prescribing a treatment plan, monitoring the child's response, and usurping a licensed physician's authority, Gonzalez engaged in the unlicensed practice of medicine. Plaintiffs are in the class the statute protects (patients and parents), and the statutory breach proximately caused their injuries.

75.    AMS and Baker aided and abetted this unlawful medical practice by providing institutional support, refusing to curtail Gonzalez's medical interventions, and explicitly defending her unauthorized medical decision-making authority over licensed medical professionals.  Plaintiffs were, at all times, members of the class that the statutes the Defendants violated were designed to protect.

76.    Defendants' violation of the statutes were the proximate cause of Plaintiffs' injuries.

77.     As a result of the Defendants' illegal acts and/or omissions in violating the statues Plaintiffs sustained injuries.

**C. Count 3- Gross Negligence**

78.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

79.     Defendants' conduct was more than momentarily thoughtlessness or inadvertence.  Rather, the acts and/or omissions by Defendants constitute gross negligence as defined in the Texas Civil Practice and Remedies Code.

80.     Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of potential harm to the Plaintiffs.  Defendants had actual, subjective awareness of the risk involved, but, nevertheless, proceeded in conscious indifference to the rights, safety, and/or welfare of the Plaintiffs and/or other similarly situated individuals.  Plaintiffs suffered damages and further seek punitive damages.

**D.  Count 4- Negligent Activity**

82.     Plaintiffs incorporate the above paragraphs by reference as if stated fully herein.

83.     Defendant AMS is the owner, operator and possessor of the daycare premises.

84.     Plaintiffs H.P., R.P., and L.P. were minor children placed in the care of Defendants and thus an "invitee" to whom Defendants owed a duty to exercise reasonable care.

85.     Defendants owed a legal duty to ensure the Plaintiffs' safety, ensuring employees are necessarily hired, trained, supervised, and terminated in order to maintain a safe environment for children.

86.     Such negligent activity on the part of Defendants proximately caused the injuries and other damages suffered by Plaintiffs.

**E. Count 5- *Respondeat Superior***

87.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

88.     The negligence, carelessness, and callousness of Defendant AMS's employees proximately caused the damage and loss suffered by Plaintiffs.    At all times material to this action, Defendant AMS's employees were acting in the course and scope of their employment.    Accordingly, Defendants may be held responsible for its employees' negligence under the doctrine of *respondeat superior*.

**F. Count 8-Breach of Contract**

89.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

90.     Plaintiffs had entered a valid contract for the provision of childcare services for their three minor children.  There was a meeting of the mind, evidenced by the signing of the contracts, applications, and general paperwork generated by Defendant AMS.

91.     Plaintiffs tendered performance according to the terms of the contract.

92.     Defendant AMS breached its duties and obligations under the contract, both explicit and implicit, pertaining to providing appropriate care, custody, and supervision by all acts stated above.

93.     Defendant AMS's breach was the proximate cause of damages to Plaintiffs, both direct and incidental/consequential.

94.     Further, Plaintiffs seek to recover their attorney fees under the Texas Civil Practices and Remedies Code.

**G. Count 9- Fraud**

95.     Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

96.     Plaintiffs discovered that Defendants had been defrauding them by making promises and commitments to get Plaintiffs' money, knowing the statements were false and that they had no intention of fulfilling.

97.     Defendants made material misrepresentations that were false.  Defendants knew these statements were false or they were made recklessly without any knowledge of the truth and as a positive assertion.

98.     Defendants made the statements with the intention that Plaintiffs would act upon it and Plaintiffs acted in reliance of the representations and causing injury, damages, and harm.

99.     Plaintiffs seek treble damages and attorney fees.

**H. Count 10- Fraudulent Inducement to Contract and Breach of Contract**

100.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

101.    The Ponders enrolled all their children at AMS because AMS stated that they followed the Montessori teaching paradigm and that they would offer full-day schooling for the three children, from 8 am to 3 pm. The Ponders relied on these assertions when entering into contracts with AMS.  The Ponders were further induced to re-enroll for a second year.

102.    AMS further promised to guide students to their fullest potential using the Montessori principles of independence, self-discipline, and social belonging.  These principles were not utilized.

103.    The AMS parent handbook, adopted into the contract, outlines procedures for programmatic changes and communication that were not followed by AMS.  The AMS parent handbook states that AMS will work in partnership with the parents.  AMS refused to provide information, observations, or inform them of incidents at the school.

104.    AMS fraudulently induced the Ponder family to contract for all three children's education.  AMS breached its contracts with the Ponders by failing to allow the children to receive full day education, failing to follow the school policies, and failing to follow Montessori

16

teachings.

105.    As a result of Defendants' fraudulent inducement, Plaintiffs suffered harm, injury and damages.  Further, Plaintiffs seek attorney fees and treble damages.

## I.  Count 11- Civil Conspiracy

106.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

107.    Defendants acted in combination to seek or accomplish a course of action to commit unlawful acts. There was a meeting of the minds of the Defendants to agree to accomplish the above stated unlawful acts.  Defendants were aware of the intended harm or wrongful conduct at the outset of the combination or agreement.  As a result, Plaintiffs suffered harm, injury and damages.

## J.  Count 12- Retaliation

108.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

109.    AMS allowed Defendant Gonzalez to make these unfounded commands and fully protected her quack medicine.  Defendants expelled H.P. in retaliation for Plaintiffs' questioning of Gonzales's medical treatment plan and for seeking a true medical diagnosis that was inconsistent with her plan.

110.    Defendants retaliated against the Ponders for the filing of a complaint with the HHS and for discussing concerns in the WhatsApp Parent Group by expelling the Ponder children.  As a further act of retaliation, AMS chose to send an email to the entire school email list, including parents, caregivers, faculty and staff, making defamatory statements against the Ponders to all families at AMS.

## VI. DAMAGES

111.    Plaintiffs incorporate by reference the above paragraphs as if stated fully herein.

112.    Defendants' acts and omissions jointly and singularly, were the proximate cause of injuries to Plaintiffs, including but not limited to:

1.  Loss of value of the tuition/fees that Plaintiffs paid for the childcare;

2.  Loss of wages for Mr. and/or Ms. Ponder incurred by having to stay home and care for their children when sent home early and later when expelled;

3.  Medical expenses for the reasonable and necessary examination of H.P.;

4.  Medical expenses for the reasonable and necessary therapy for Plaintiffs;

5.  The cost of the inappropriate medical treatment prescribed by Gonzales;

6.  Physical pain and suffering in the past;

7.  Mental anguish in the past;

8.  Mental anguish, in reasonable probability, sustained in the future;

9.  Lost wages in the past;

10. Lost wages, in reasonable probability, sustained in the future;

11. Loss of wage-earning capacity in the past;

12. Loss of wages/earning capacity, in reasonable probability, sustained in the future;

13. Loss of normal enjoyment of the pleasure of life in the past;

14. Loss of normal enjoyment of the pleasure of life, in reasonable probability, sustained in the future;

15. Treble damages;

16. Punitive damages;

17. Pre-judgment and post-judgment interest;

18. Court costs;

19. Reasonable and necessary attorney fees; and

20. Costs of suit.

## VII. CONDITIONS PRECEDENT

113.    All conditions precedent have been performed or occurred, except for mediation which is addressed below.

## VIII. JURY DEMAND

114.    Plaintiffs respectfully demand the right to have a trial by jury and have tendered the jury fee in Travis County District Court.

## IX. PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer, and that on final trial Plaintiffs have and recover:

1. Judgment against Defendants for a sum in excess of the minimum jurisdictional limits of this Court;

2. Pre-judgment at the highest legal rate;

3. Reasonable and necessary attorney's fees;

4. Taxable Court costs;

5. Post-judgment interest on the above amount at the highest legal rate; and

6. Such other and further relief to which Plaintiffs may show themselves justly entitled in law or equity.

Respectfully submitted,

**WELBORN LAW LLC**
8712 Mesa Suite B206
Austin, Teas 78759
Telephone: (512) 825-3390

By: */s/ Amy C. Welborn*
    Amy C. Welborn
    State Bar No. 24012853
    amy@welborn-law.com

**ATTORNEY FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system on 11th day of June 2025.

*/s/ Amy C. Welborn*
Amy C. Welborn

REDACTED PUBLIC VERSION

# EXHIBIT 1

H▊ Ponder
Entering  2024 – 2025
Grade    CH Mid Cycle – Early Childhood



**Austin Montessori School**

## AMS Year-Round All School Enrollment Agreement 24-

**Introduction**

H▊ Ponder

Entering Year: **2024 – 2025** Date of birth: ▊

This contract ("Contract") is between Austin Montessori School ( "School") and the parent or legal guardian ("Parent," singular or plural, as applicable) of the above-mentioned student ("Student"). Parent must complete and sign this Enrollment Contract and Tuition Schedule by clicking "submit" to the School for processing. Once submitted, a copy is available for your records in the Files & Forms section of your profile.

**Parent Partnership Agreement**

By signing this contract, Parent agrees to the policies and guidelines outlined in the <u>AMS Parent Community Handbook and Partnership Agreement</u>.

**This is a legally binding contract. Read it carefully.**

**Tuition and Fees**

Annual tuition is listed under the "Expenses" section below. Parent agrees to pay the tuition  specified below according to the terms of this Contract.  Parent acknowledges that the tuition changes as the Student's participation in the School program change (i.e., advance in level).  If any change occurs after the school year starts, Parent agrees to pay the School the increased amounts as specified in the published tuition and fee schedule:

AMS Tuition and Fee Schedule 2024 - 2025.

**New Family Fee**

A family new to Austin Montessori School will be charged a one-time fee of $500.  This fee will be added to the Smart Tuition account and is in addition to the tuition and fees listed on the Enrollment Contract.

---

**Expenses**

| | |
|---|---:|
| Children's House - Year Round | $20,265.00 |
| **Total Expenses:** | **$20,265.00** |
| | |
| **Total Due:** | **$20,265.00** |
| | |
| **Due at Enrollment** | |
| Deposit | $300.00 |
| **Total Due at Enrollment:** | **$300.00** |

Please review the descriptions below for the available payment plans, and then choose your desired option in the section below.

Printed    1/17/2024

H█████ Ponder
Entering  2024 - 2025
Grade    CH Mid Cycle - Early Childhood



**Austin Montessori School**

## AMS Year-Round All School Enrollment Agreement 24-

· •One Payment Option: payment of tuition for the Student's program to be paid in one payment on or before June 3, 2024.

· •Monthly Payment Plan Option for Regular Year Programs: payment of tuition for the Student's program to be paid in 12 equal payments, with the first payment due on August 3, 2024, and on the 3rd day of each month thereafter through July 3, 2025. The monthly payment plan option will incur a fee of $27.08/month ($325 total/year)



12 Month Plan
12 Payments
✓

### Terms of Enrollment

### Austin Montessori School Terms of Enrollment

Parent understands that all persons responsible for paying any of the amounts due under this Contract must execute the Contract and that all such persons are jointly and severally liable for the amounts due as set forth herein. Parent's signature and/or initials on this Contract evidence Parent's understanding and agreement to the terms of this Contract, as follows:

1.•**Enrollment**: Student will be enrolled for the 2024-2025 academic year. Parent is aware that a final determination of grade and classroom placement will be made by the School in accordance with the School's admissions policies and these decisions are made at the School's discretion. This Contract is valid only for the academic year stated and does not entitle Student to any future enrollment.

2.•**Tuition Obligation**: Parent understands that Student is being enrolled for the academic year covered by this Contract (or remaining portion thereof, in the case of a mid-year enrollment or mid-year move to another level). Parent acknowledges that the tuition and fees change as the Student's participation in the School program change (i.e., advance in level). If any change occurs after the school year starts, Parent agrees to pay the School the increased amounts as specified in the School's published tuition and fee schedule. Parent is responsible for the full tuition amount through the end of the academic year even if Student is withdrawn from or ceases to attend the School. Parent further understands that the overhead expenses of the School do not diminish with the departure of a student during the course of the school year and agrees that it is impossible for the School to determine at the time of the execution of this Contract the damage and loss to the School that would occur due to the later cancellation/withdrawal of students who have enrolled. Therefore, once this Contract has been submitted to the School, Parent becomes liable for the tuition, according to the following schedule:

· •Through May 1, 2024 – responsible for 25% of annual tuition payment

· •After May 1, 2024 – responsible for 100% of annual tuition payment

3.•**Termination Procedures**: Parent may terminate this Contract by submitting a WRITTEN termination notice ("Termination Notice") to the Head of School by May 1, 2024 ("Partial Release Date"). The Termination Notice must (a) be dated, (b) state the Student's name, (c) provide a reason for the termination of the Contract; and (d) be RECEIVED by the Head of School on or before the Partial Release. If such Termination Notice is received before the Partial Release Date, Parent will be partially relieved of tuition obligation as provided in Paragraph 2, above.

4.•**School/Family Partnership**: A positive and constructive working relationship between the School and Parent is essential to the fulfillment of the School's educational purpose. Thus, the School reserves the right not to extend the privilege of enrollment or re-enrollment to Student if the School reasonably concludes that the actions of Parent make such a positive and constructive relationship impossible or otherwise seriously interfere

Printed    1/17/2024

H███ Ponder
Entering 2024 - 2025
Grade   CH Mid Cycle - Early Childhood



**Austin Montessori School**

### AMS Year-Round All School Enrollment Agreement 24-

with the School's accomplishment of its educational purpose. Moreover, the School reserves the right to dismiss Student at any time if, in the judgment of the Head of the School, conduct of anyone directly associated with Student, including but not limited to Student's Parent, in or out of the School, is not in keeping with the School's accepted standards or principles. There will be no refund of tuition in the case of such dismissal and any unpaid balance is payable in full according to the terms of this Contract. If for any reason, the School administration determines that it is in the best interest of the School, The School also reserves the right to withdraw an offer of enrollment or re-enrollment at any time, and/or to nullify an executed Enrollment Contract, if the School administration determines, in its sole discretion, that doing so is in the best interest of the School.

5.•**Tuition Assistance**: Parent understands that if the Student has applied for or received a tuition assistance award toward the amount of tuition hereunder; the Parent remains primarily responsible for all obligations under this Contract. Upon Parent's acceptance of this contract and the tuition assistance award, Parent agrees to pay the balance due pursuant to the payment plan established by the School.

6.•**Probationary Enrollment for New Students:** All new enrollments are probationary for an eight-week period. If the school is concerned that this enrollment is not in the best interest of the child or the classroom, a conference will be held before the end of the eight-week period with the Head of School, Level Director, Director of Enrollment Management, and parents. Possible outcomes include an agreement to terms of continued, conditional enrollment, or withdrawal of enrollment. The decision to continue or withdraw enrollment is at the sole discretion of the school and is final. The school reserves the right to refund any portion of the tuition based upon the student's withdrawal from the school. Any refund shall be at the sole discretion of the school. In accordance with Austin Montessori School's admissions policy, enrollment beyond the eight-week period lies solely at the discretion of Austin Montessori School.

7.•**Termination of Student's Attendance**: The School has the right to suspend or terminate any Student if (i) in the sole discretion of the School administration, it is determined that the continued attendance of the Student is detrimental to the School community, the Student or to the other students of the School, or (ii) the Parent has failed to pay all or any part of the tuition or fees required under this Contract.

8.•**School Rules**: Student's enrollment at the School is subject to the general statements, rules regulations, conditions, traditions, and financial terms contained in the School's Community Handbook and other published documents, which may be amended from time to time. Parent acknowledges that Parent and Student must abide by such School rules and guidelines.

9.•**Transcripts/Records**: All accounts must be paid in full before records and transcripts can be released or transferred to other schools. Student will not be allowed to continue to attend classes or other programs or activities unless tuition and fees are paid by stated deadlines (or until Parent makes other written arrangements acceptable to the School). The School shall have the right to take such legal action as it may deem appropriate to collect all amounts which are not paid when due. In the event that the School takes legal action to enforce the terms of the Contract, Parent shall be responsible for all costs, including reasonable attorney's fees and costs (whether incurred before, during or after the filing of the lawsuit).

10.•**Delinquent Payments**: Parent understands and agrees that a late charge of $35 will be added for any payment not received within 10 days after the due date ("Late Payment"). Parent understands that at no time does the School intend to contract for, charge, or receive interest in excess of the maximum amount permitted by law and, if it is determined that the School has done so, the School shall credit the excess to any remaining tuition or fees due under the Contract or refund the excess to Parent. In the event that a Parent is more than 90 days in arrears with any tuition or fees due under the Contract, the School reserves the right to accelerate the remaining tuition and fees due under this Contract.

11.•**Release of Student Records**: Parent consents and holds the School harmless for the release of Student's records and information upon request by an education institution or law enforcement agency. Parent also releases and holds the School harmless from any liability stemming from such use, disclosure, or release of Student's records or information.

12.•**Governing Law/Disputes/Waiver of Jury Trial**: This Contract shall be governed under the laws of the State of Texas. In the event of a dispute regarding the terms of this Agreement or Student's enrollment at the School, the parties agree to first try to resolve such dispute informally through non-binding mediation. The costs of mediation shall be equally borne between the parties. In the event of litigation, the venue of any action hereunder shall lie exclusively within the Circuit Court of Travis County, Texas, and the parties hereto consent to personal jurisdiction and expressly waive all right to trial by jury.

H█████Ponder
Entering 2024 - 2025
Grade    CH Mid Cycle - Early Childhood



**Austin Montessori School**

## AMS Year-Round All School Enrollment Agreement 24–

13.•**Understanding of Terms**: Please read this Contract carefully. By signing below, Parent acknowledges that Parent understands the terms of this Contract, Parent's obligation to pay the full year's tuition even if the Student is withdrawn or dismissed, the Parent's option to terminate, and all other obligations set forth herein. If Parent has questions about the terms, Parent is encouraged to seek the advice of counsel or to seek clarification from the Director of Admission.

14.•**Force Majeure**: The School's duties and obligation under this Contract shall be suspended immediately without notice during all periods that the School is closed because of force majeure events including, but not limited to, any fire, act of God, hurricane, war, governmental action, an act of terrorism, epidemic, pandemic, strike, civil unrest, or any other event beyond the School's control. If such an event occurs, the School's duties and obligations in this Contract will be postponed until such time as the School, in the sole discretion of the School administration, may safely reopen. In the event that the School cannot reopen due to an event under this clause, the School is under no obligation to refund any portion of the tuition paid.

*Austin Montessori School does not discriminate on the basis of race, ethnicity, national origin, ancestry, gender, gender identity or expression, sexual orientation, age, or disability in the administration of its hiring, admissions policies, tuition assistance program, or other school-administered programs.*

To ensure a place for the Student, this Contract must be executed and submitted to the School, along with the $300 registration fee.

Ross Ponder

| | |
|---|---|
| Signature | Date |

Sarah Ponder

| | |
|---|---|
| Sarah Ponder | 1/17/2024 |
| Signature | Date |

Accepted by Austin Montessori School, Inc. a Texas non-profit corporation

## Grae Baker

**Name:** Grae Baker
**Title:** Head of School

**School Signature**

Grae Baker