12/10/2025 3:46 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-002212
Stephanie Garza

CAUSE NO.  D-1-GN-25-002212

| | | |
|---|---|---|
| ROSS PONDER AND SARAH PONDER, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY, AND AS NEXT FRIEND | § | |
| OF H.P., L.P., and R.P., MINORS, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC.; | § | |
| RONALD GRAE BAKER, INDIVIDUALLY; | § | |
| and JINNY GONZALEZ, INDIVIDUALLY, | § | |
| Defendants. | § | 345TH JUDICIAL DISTRICT |

## PLAINTIFF'S THIRD AMENDED PETITION

COMEN NOW Plaintiffs, Ross Ponder and Sarah Ponder, Individually and as Next Friend

of H.P., a minor ("Ponders" or "Plaintiff"), file their Third Amended Petition against Defendant

Austin Montessori School, Inc.("AMS"), Grae Baker ("Baker"), and Jinny Gonzalez ("Gonzalez")

(collectively "Defendants") and show the Court as follows:

## I.DISCOVERY CONTROL PLAN

1.      Plaintiffs intend to conduct discovery under Level 3 pursuant to Rule 190.4 of the Texas

Rules of Civil Procedure.

## II.      PARTIES

2.      Plaintiffs Ross and Sarah Ponder are the parents of Plaintiff H.P., L.P., and R.P., minors.

Plaintiffs reside in Travis, County, Texas.

3.      Defendant Austin Montessori School, Inc. is a Texas corporation with its principal place

of business at 5006 Sunset Trail, Austin, Texas 78745.  Austin Montessori School, Inc. can be

served through its registered agent, Sandra Bartholome at 5006 Sunset Trail, Austin, Texas 78745. Defendant has previously answered and accepted service.

4.      Defendant Ronald Grae Baker is an individual that resides in and can be served at his principal place of business at 5006 Sunset Trail, Austin, Texas 78745 or at his residence at 10521 Redmond Road, Austin, Texas 78739.  Defendant has previously answered and accepted service.

5.      Defendant Jinny Gonzalez is an individual that resides in Travis County and can be served at her principal place of business at 5006 Sunset Trail, Austin, Texas 78745 or at her residence at 2907 Pops Way, Austin, Texas 78745.  Defendant has previously answered and accepted service.

## III. JURISDICTION AND VENUE

6.      Subject matter jurisdiction is proper because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

7.      Venue us proper in Travis County, Texas, under Texas Civil Practice and Remedies Code Sec. 15.002(a) as all or substantially all of the events that give rise to this claim occurred in Travis County.

## IV.  SUMMARY

8.      The Ponders fully embraced Montessori practices and were excited to have enrolled their children at AMS.  Unfortunately, it became evident over time that AMS had adopted their own practices and interpreted Maria Montessori teachings in a way that was meaningfully different from other Montessori schools.  AMS's administrative staff had their own beliefs and practices that were not explained prior to enrolling the Ponder children.  These practices were very harmful to the Ponder children, especially H.P.

9.      The Ponders had a history of ADHD in their family and as such wanted to put their children in a Montessori School because studies have shown that an adapted educational environment, such as a Montessori school is beneficial for children who respond differently, have trouble staying focused, or need redirection.

10.     Montessori education emphasizes self-directed learning, movement, and a prepared environment. Montessori education principals involve the use of collaboration with the parents to create a support plan to best support children with unique needs.

11.      Further, Montessori education emphasizes discipline through positive guidance and self-regulation, rather than punishment. There are no rewards or punishments in Montessori education. Instead, the focus is on respectful interactions, encouragements, and redirection.

12.     Only after contracting with AMS, were the Ponders made aware that AMS did not follow the teachings and Montessori methods.

13.     Defendants did not believe in collaboration with the parents to create support plans.  In fact, Defendants intentionally prevented information from being shared with parents regarding the support needs of the students.

14.     Defendants did not follow the no rewards or punishment teachings.  The school had questionable and inappropriate punishments that the Ponder children and many other students were subjected to on a regular basis.

15.     Defendants also did not disclose that they did not follow common Western medical practices adopted in the State of Texas and had adopted their own form of quack medicine used to diagnosis and treat their students.

16.     AMS failed to admit that they did not believe children should be diagnosed with ADHD, and did not believe in the use of medication to treat the diagnosis.

17.     Nor did AMS admit that failure to follow their set medical treatment plans and to seek outside medical care or treatment would result in expulsion.   Instead, they fraudulent induced the Ponders into contracts and then failed to follow the basic rules of law in the care and treatment of the Ponder children.

18.     Further, AMS allowed and supported Jinny Gonzalez, the Director of Early Childhood Programs, to practice medicine without a license.  The AMS administration fully supported Jinny Gonzalez and allowed her to make diagnoses of children, knowing she had no medical training. Ms. Gonzalez "diagnosed" H.P. with "an underdeveloped will" in September 2023 and offered to treat H.P.'s disorder.  Based on her diagnosis, Ms. Gonzalez made specific demands of the Ponders as part of her quack medicine treatment.  Her treatment plan was psychologically abusive, harmful, and disruptive.

19.     To prevent exposure of AMS's quack medical and/or manipulative controlling practices and other harmful practices, AMS refused to provide important information to the parents of the children attending AMS.

20.     To hide improper discipline and negligent activity, the parents of AMS students were not given meaningful opportunities to communicate with the staff working with their children.

21.      H.P. was often isolated from his peers and taken out of the classroom with a staff person. At other times he was sent to a bathroom either with a staff person or alone.

22.     The Ponders were provided very minimal information about individuals who were alone with and in charge of H.P.'s supervision.  The Ponders had a right to know if this individual was qualified to be working with their child.  The Ponders had a right to know what this individual was doing with their child when he was isolated and H.P.'s reaction to this treatment method the school had imposed upon H.P.

23.     AMS had created a medical treatment plan and then failed to allow the Ponders to access medical records, school records, and treatment records in violation of state and federal law.

24.     The Ponders were repeatedly called to AMS on short notice to pick up H.P. and/or R.P. without being given any information regarding the alleged incident that had occurred.  It was impossible to discern if there were actual issues with H.P. or R.P. or the nature of the alleged concerns because AMS hid the information to the detriment of the entire Ponder family.

25.     Upon questioning AMS's quack medicine practices and controlling and manipulative actions and bringing them to the attention of other family members at AMS and the Texas Health and Human Services, AMS retaliated by expelling all of the Ponder children without notice, including the oldest child, who was in elementary school.

## V.  FACTS

26.     The Ponders first enrolled at AMS in August of 2023.  The Ponder children had been enrolled in another Montessori school and the children thrived in the Montessori environment. The Ponders live very close to AMS and hoped to enjoy the opportunity to walk to school and feel a close connection to the AMS community.

27.     The Ponders were further drawn to the promise of collaboration and communication in the education of their three children and had hoped to keep all three children enrolled through their middle school education.  The Ponders had believed AMS would provide a nurturing supportive environment for their children of all abilities and learning styles in keeping with Maria Montessori's teachings.

28.     The Ponders were told by the AMS administration multiple times from 2022 to 2023 that it was extremely rare to be admitted when children were over 4.5 years old.  When the May 2023

fall admission opened, they were told to take it, as it was very unlikely that a spot would be available the following year.

29.     The Ponders enrollment contracts were for an 8 am-3:15 school day (full-time) for all three children.  The AMS administration did state that lunchtime pickup was an option if a child was not a napper, making it seem that a failure to nap would not prevent the student's success at AMS. (However, students were not required to nap after age 4.5.)  While the Ponders were required to remain under contract when two of the three children's school day hours were reduced, the reduction in the amount of tuition was minimal (about $3000 a year) and the cost for other care to replace the contracted care was significant.  This caused great financial burden to the Ponders.

30.     H.P.'s first day at AMS was August 17, 2023.   AMS provided an update and noted that there were no issues when H.P. napped.  It was also noted that H.P. did not like his lunch, which the Ponders had prepared according to AMS's strict school lunch requirements.

31.     On August 20, 2023, H.P. turned four years old.

32.     On or about August 29, 2023, the Ponders were informed that their son, H.P. was having issues sleeping during nap time.  A meeting was immediately held the same day to address the matter.

33.     Regardless, on Thursday, August 31, 2023, AMS informed the Ponders that H.P. would need to be picked up starting at noon each day because he was not napping.  The Ponders were told this was a transition period for AMS to allow H.P. to get used to the new classroom.  The Ponders were not given any alternatives and were told that they had to pick him up at noon.  The Ponders specifically chose to enroll their three children at AMS because it allowed for full day coverage for all their children, allowing them to work demanding full-time jobs.

34.     Throughout the next weeks, the Ponders made numerous attempts to update the school regarding H.P.  AMS, in turn, did not provide quality feedback but pushed H.P.'s release time to 10 am, a mere two hours after his arrival time without explanation.

35.     AMS did not offer to compensate the Ponders nor did AMS discuss letting the Ponders out of their contract.  The Ponders were left financially strapped into a contract for full-time care but were receiving less than two hours a day to complete their work before they were forced to bring their young son back home.

36.      On Friday, September 8, 2023, Jinny Gonzalez emailed the Ponders to request a meeting regarding H.P.'s "dysregulation."  The Ponders were told that H.P. was not allowed to return to the school until after the meeting occurred.

37.     Over the weekend, the meeting was scheduled for September 11, 2023.  The meeting would include the Ponders, Jinny Gonzalez and Sveta Paris.  None of the classroom staff was invited to attend.

38.     Ms. Gonzalez informed the Ponders that H.P. would not be allowed to attend AMS until September 12, 2023, meaning the Ponders had to arrange childcare for H.P so that they could attend the meeting.

39.     At the September 11, 2023, meeting, AMS stated that they "interpret behavior differently from the normative."  AMS notified the Ponders that instead of trying to work with H.P. on his behaviors they were "going to control the systems."  It was at this meeting and in her follow-up correspondence that Ms. Gonzalez diagnosed H.P. and laid out her treatment plan for H.P.

40.     Ms. Gonzalez's medical treatment plan required that the Ponders follow a consistent routine in the mornings and even recommended that they "modify the time each family member goes to bed and wakes up."

41.    Ms. Gonzalez instituted rules for speaking to H.P., requiring that the Ponders only provide brief and factual information to their son and that they acknowledge his feelings only with humor and lightness.

42.    Ms. Gonzalez forbid the Ponders from walking to school and required that H.P. arrive by car at exactly 8 am daily.  She further demanded that H.P. be seated in the car closest to the entrance and that the Ponders were not allowed to exit the vehicle or help H.P. exit the vehicle.

43.    Ms. Gonzales informed the Ponders that H.P. would only be allowed to attend school until 10 am, meaning he would attend school for only two hours a day, until another meeting could be held in two weeks.

44.    During this two-week period, Ms. Gonzlez and AMS were treating H.P.'s condition and she would determine if H.P. made progress in his treatment that would allow H.P. to attend for a longer day.

45.    AMS and Ms. Gonzalez also required that the school counselor, Leslie Grove observe H.P. Ms. Gonzalez stated that the treatment plan would "break the habit" of H.P. being in distress.

46.    AMS informed the Ponders that the latest H.P. would be allowed at AMS was noon, even after they had "controlled the systems" with their medical treatment plan.

47.    Ms. Gonzalez also demanded that the Ponders keep their phones on at all times to accommodate immediate pickups when AMS required it.

48.    On September 12, 2023, Leslie Grove notified the Ponders that she would observe H.P. on September 18, 2023, and that she wanted to schedule a conference to discuss H.P. with the Ponders. This was scheduled for September 27, 2023.

49.    On September 15, 2023, the Ponders requested an update on H.P. and asked if he could gradually leave a little later.  Ms. Gonzalez informed the Ponders that this would not be an option and that H.P. would continue attending school until 10 am.

50.    Another meeting was scheduled on Thursday, September 21, 2023, to discuss the progress of H.P.'s treatment of his condition.

51.    On September 21, 2023, Jinny Gonzalez emailed the Ponders stating that AMS had to cancel the meeting due to being very busy.  They agreed to reschedule the meeting to September 26, 2023, and to move the pick-up time for H.P. the following week to allow him to stay until 10 am on Monday and Tuesday, 10:30 am on Wednesday and Thursday and 11 am on Friday.

52.    At the September 26, 2023, meeting, additional requirements were added for the Ponders by Ms. Gonzalez for the treatment of H.P.'s condition.  This included feeding H.P. on a tray in the bathroom each morning instead of with his siblings.

53.    On September 29, 2023, the Ponders were able to have a call with H.P.'s Guide, Lesley Williams to discuss his improving progress.

54.    On October 2, 2023, Lesley Williams informed the Ponders that H.P. had been improving and had "the best day at school so far."  There was no concern that he had behavioral issues that the school could not address. His time at the school was extended to noon each day.

55.    On December 8, 2023, AMS stated that they were honored to work with the Ponders and that with regard to H.P., they "deeply desired to meet his needs."  They were very positive and noted the Ponders followed the treatment plan that AMS had instituted through. Ms. Gonzalez. However, they still refused to allow H.P. to attend school full-time.

56.    AMS suggested hiring an occupational therapist to work with H.P. At the recommendation of Jinny Gonzalez, the Ponders hired Jennie Buckley but later determined she was not an

occupational therapist but yet another unqualified medical provider that Ms. Gonzalez and AMS recommended as part of their quack medicine. This caused a delay in getting H.P. an OT evaluation.

57.     On December 20, 2023, Leslie Grove, the school psychologist, observed H.P. and found that he was doing very well. She noted that she would not be connecting with AMS administration until late January to discuss her findings. She noted that she and Ms. Gonzalez were best suited for determining when H.P. could extend his day.

58.     Regardless, and without waiting for their own psychologist's assessment, on January 5, 2024, Jinny Gonzalez instructed that H.P. no longer be allowed at the school past 11 a.m.

59.     Again, the contractual terms and payments were for full day coverage, not a two-hour drop off. The school informed them that they had additional new children and due to accommodating them, they would need to pick up H.P. early each day until AMS was able to adapt to the new students.

60.     On January 23, 2024, AMS informed the Ponders that they were "changing things" and would not accommodate H.P. attending for more than a few hours each day at that time. The Ponders provided more recent evidence from the school of H.P.'s positive improvements.

61.     On January 31, 2024, Ross Ponder's brother became ill and died March 5, 2024. AMS refused to accommodate H.P. staying for a full day as contracted. They even denied a request to allow him to stay when Ross had to leave town and was unable to pick up H.P. at 11:45 am. Ross Ponder was trying to leave town to see his brother before life support was pulled. The school administration offered no meaningful condolences and did not offer reasonable courtesies for the parents.

62.     On February 20, 2024, H.P. turned 4.5 years of age.  This is significant because it is AMS policy that children 4.5 years of age or older do not have to nap in Casita and are invited to stay until 3:15 p.m. daily without a nap.  H.P., like all other children, should have been allowed at AMS until 3:15 p.m. daily even if he was not taking a nap.

63.     Unfortunately, AMS determined that H.P. must continue to nap, something he clearly was not wanting to do anymore.

64.     During naptimes when H.P. was not sleeping, he was directed to the bathroom where the staff had him remain alone for long periods of time, in the dark.

65.     It was considered an acceptable practice at AMS to punish and/or direct a child to a dark bathroom if the child was not sleeping during nap time.

65.      H.P. had his initial OT evaluation on April 26, 2024.  The school agreed to meet and discuss on May 17, 2024.

65.     On May 16, 2024, Jinny Gonzalez informed the Ponders that they again had staffing issues that prevented H.P.'s teacher, the one who interacted with him daily, to attend the meeting on May 17, 2024.

66.     At the May 17, 2024, meeting, the Ponders reported on the OT evaluation.  The Ponders requested that H.P. be transitioned to extended day, as they had contracted for full-time school.

67.     The school refused to allow H.P. to go full-time in June and stated that they would need to wait for an evaluation in July when his teacher returned from vacation.  It was evident that the school had staffing issues that needed to be addressed.

68.     On July 2, 2024, immediately upon her return from vacation, Ms. Williams, H.P.'s teacher communicated with the Ponders and stated that H.P.'s day should be extended to 12:30 pm.

69.    By July 30, 2024, it was becoming more evident that AMS had serious staffing issues. Jinny Gonzalez sent multiple communications to all the families at AMS notifying them of staffing changes.

70.    While the plan was for H.P. to begin transitioning to full day school, AMS continued to ask for him to be picked up early.

71.    Additionally, AMS began requiring that R.P. to also be picked up early.  Further, according to AMS staff, at times there were as many as 39 children in the nap program called Casita.

72.    The teachers/Guides were clearly working without enough support and even disclosed their stresses and personal medical information regarding hormonal changes to the children.

73.    While Montessori teachings allow students to be given guidance and redirection, they do not punish.  However, AMS was allowing the stressed teachers to punish children and classes. Access to water bottles was restricted to an entire class as a punishment and students were sent to dark bathrooms.

74.    On September 11, 2024, the Ponders notified the school that the family's beloved dog was going to have to be put down.

75.    On September 12, 2024, Jinny Gonzalez again provided notice to all the families of staffing concerns.

76.    On September 12, 2024, the AMS called the Ponders at noon, stating that the youngest Ponder child, R.P., would need to be picked up early.   The Ponders were informed that AMS was "unsuccessful" and that they were not fulfilling the R.P.'s need for sleep and rest.

77.    When AMS demanded that the Ponders pick up their children with unreasonable notice, the Ponders made clear that they were not available because their beloved family dog, Bear, was actively dying of cancer that afternoon in their home.  Bear died around 3 pm and the Ponders

were forced to coordinate emergency vet transportation while simultaneously coordinating the school pickups AMS demanded.

78.    AMS then determined that R.P. did not fit their program because she was a bad napper. The Ponders had had multiple communications with AMS during the first few weeks of school and was informed she was doing well, and no napping concerns were raised.   The demand that she be picked up early was shocking to the Ponders.  R.P. had no problems with napping at her prior school and no concerns had been raised at AMS. (Interestingly, R.P. has no napping issues at her current Montessori school.)

79.    On September 13, 2024, AMS again requested that both children be picked up early. Again, there were significant staffing issues at AMS.  The Ponders asked for a review of the parent partnership agreement, as clearly AMS was in breach.

80.    On November 22, 2024, Jinny Gonzalez scheduled a meeting regarding H.P.'s progress under her treatment plan for December 5, 2024.  The Ponders asked to discuss if any interim changes needed to be made and informed AMS that H.P. would be going to the doctor to determine if he had ADHD.   AMS refused to fill out the requested Vanderbilt questionnaire.

81.    On December 3, 2024, H.P. was formally diagnosed with ADHD.  The Ponders provided the diagnosis and medical documentation to AMS immediately.

82.    On December 5, 2024, at the scheduled meeting to discuss H.P.'s progress and accommodations, Jinny Gonzalez stated that she did not think that AMS was the right school for H.P.   Ms. Gonzales stated that she did not believe in medicating a child for ADHD and did not approve of the treatment plan of H.P.'s physician.  In fact, with the support of AMS, Gonzalez specifically discussed her medial plan, delaying medicating H.P.

83.    Oddly, in the meeting report, Ms. Gonzalez specifically noted that some children require accommodations and that it is the Montessori philosophy to use every resource available to aid in a child's development and stated that they "deeply desired to meet his needs."

84.    On December 6, 2024, Jinny Gonzalez, stated that H.P. could no longer benefit from a Montessori education.  AMS shortened H.P.'s days to half days.

85.    On December 7, 2024, H.P. was started on ADHD medication, which had very positive effects on the child.  The Ponders requested that H.P. receive new evaluations by AMS to determine the effects of the new medication, which they had found effective.

86.    On December 16, 2024, the Ponders met with Grae Baker and School Advisor, Jeff Schneider. Mr. Baker told the Ponders that AMS can accommodate an ADHD diagnosis and medicinal treatment. Mr. Baker agreed to delay enrollment decisions for H.P. until the middle of the spring semester and to provide regular updates on H.P.'s response to medicine.

87.    Over the holidays, the doctor was able to work to find the proper medication dose to best assist H.P.  This led to significant improvement in his ADHD behaviors.

88.    From December 16, 2024, to January 27, 2025, AMS refused to provide requested feedback to the Ponders on H.P.'s response to medication.  Grae Baker falsely promised to withhold an enrollment decision for the following year until the middle of the spring semester to allow AMS to observe and update the Ponders on H.P.'s response to medication.

89.    The Ponders made repeat requests for an accommodation meeting and requested that Ms. Gonzalez be taken off the team, due to her alternative treatment methods not being accepted over those of H.P.'s physician.

90.    On January 17, 2025, Grae Baker sent correspondence stating that AMS would not be offering an enrollment contract for the following year to H.P.  Mr. Baker also chastised the Ponders

for requesting that Ms. Gonzalez be removed from H.P.'s case, stating AMS's support for Gonzalez and her quack medicine.

91.     On January 20, 2025, the Ponders again requested a meeting to discuss the observations of H.P. in the weeks after he had started ADHD medication.

92.     On January 24, 2025, the Ponders met with Grae Baker and Jeff Schneider, the School Advisor.  In preparation for this meeting, they requested to discuss communication issues and stated that these issues were pervasive throughout the school, noting other parents had similar concerns.

93.     The Ponders were concerned with the lack of communication and the systematic barriers that prevented parents from being informed of concerns regarding their children.  The Ponders noted that no incidents had been report at AMS since winter break, and that H.P. was responding well to medication, including at church, YMCA, and other common places.  Mr. Baker informed them in this meeting that not only was H.P. not allowed to return next semester, that AMS was expelling H.P. on February 7, 2025.

94.     On January 24, 2025, the Ponders filed a complaint with the Texas Health and Human Services.  The fact that this complaint was filed was made known to AMS on January 25, 2025. The Ponders chose to file this report based on their experiences and after reviewing AMS' most recent HHS inspection in October 2024, which recorded deficiencies in recordkeeping, naptime, and operational policies regarding suspension and expulsion. The Ponders also requested to receive copies of these relevant records and policies but were denied by AMS.

95.     On January 28, 2025, Grae Baker emailed to inform the Ponders that all the Ponder children would be expelled if the Ponders did not follow the demands of AMS, including their quack medicine treatment plan.

96.    The same day, the Ponders informed the other school parents of the ongoing issues in a WhatsApp post, in an effort to make change and to help all students, an effort to gain community support and raise concerns, as the discrimination and relation were factors all parents should be informed of when renewing enrollment.  The WhatsApp group was a private, optional, parent run platform that was not associated with the school administration.

97.    A coffee was also held at the Ponders home to further discuss systematic communication issues affecting many students at AMS.

98.    On January 29, 2025, the Ponders received H.P.'s initial evaluation from Austin ISD. AISD determined that H.P. had ADHD.  AISD determined that H.P. would be placed in a standard classroom and did not need special education or occupational therapy. The results were immediately distributed to AMS and the Ponders requested a meeting with Gina Applegate, the school support specialist, Jinny Gonzalez, and Lesley Williams.

99.    The Ponders included Jinny Gonzalez in this communication because Grae Baker had stated it was a requirement for the continued enrollment of L.P. and R.P. in his email dated January 28, 2025.

100.    On January 30, 2025, Grae Baker sent a letter to all parents at AMS stating that the information provided by the Ponders was "misleading" and that "false claims" were made.

101.    On January 31, 2025, AMS terminated the enrollment of all three children.  It was stated by AMS that the terminations occurred because the Ponder parents' "actions were detrimental to the school."  Clearly the actions referred to are the filing of the HHS complaint, advocating for disability accommodations, and reaching out to other parents to discuss the concerns and determine if others were in a similar situation.   The termination of the remaining Ponder children was retaliation.

102.    While at AMS, improper punishment was used on Plaintiff H.P.    He was repeatedly not allowed to finish his meals.  HP was placed in a dark bathroom alone and/or with an adult for punishment and not for bathroom activities. H.P.'s outdoor play time as taken away.  .  Further, he was humiliated, instructed to clean up, and when something was outside his capabilities, instead of helping he was ridiculed and made to continue the task for extended periods of time.  All of these punishments and actions are direct violations of state law and regulations

103.    The impact on the family has been extreme.  While attending the school, the quack medicine diagnosis and treatment plan instituted by Ms. Gonzalez caused H.P. harm.  It further prevented him from getting the proper diagnosis with a licensed physician.  H.P. was forced to attend expensive outside services at the demand of AMS.

104.    H.P. has suffered extreme anxiety, mental anguish and distress at the hands of AMS.  The level of torture he experienced was not understood until he was placed in a new school, where he is not only thriving, but has had zero behavior problems and is a model student.  Clearly, the root of his behavior problems stemmed from AMS's intentional and negligent failure to address his needs. The Montessori teaching is to provide peaceful development, particularly from ages three to six, something that AMS did not provide the Ponder children.

105.    The malicious punishments and unreasonable demands made of H.P. and the Ponders caused chaos, anxiety, and disruption of the entire family.  The Ponders entire lives were dismantled, as the school would call with less than 15 minutes notice and demand that a child be picked up. They were no longer allowed to walk their children to school and were told when and how to wake their children each morning.    Maria Montessori stated, "We must respect the child, and he must understand that he is respected."  AMS neither respected nor made the Ponders feel respected.  Further, the Ponders were forced to spend thousands of dollars on demanded outside

OT and other treatments that Ms. Gonzalez prescribed to treat the diagnosis of "underdeveloped will." These treatments were not necessary or beneficial to treat H.P.

106.    Due to the change in hours, Ross Ponder was forced to quit his job, to allow him to be available to pick up the children on a moment's notice.  This has been detrimental to his income in both the long and short term.

107.    The impact on Sarah Ponder's career is significant. Some of her clients were in the AMS community.  Sending a letter to the entire community defaming the Ponders will have serious long-term impacts on her company's growth.  Ms. Ponder is aware of at least one client that she lost due to this entire situation.

108.    The impact on the children has been significant.  They were forced from their school and the friends they had expected to go to school with until they graduated middle school.  They were not able to be immediately placed in school, and the oldest child is in elementary school, thus causing a severe impact to her education.

109.    The expulsion caused extreme mental anguish for the entire family.  Maria Montessori stated, "The things the child sees are not just remembered; they form part of his soul."  This will forever impact the Ponder family.

110.

## VI. CAUSES OF ACTION

### A. Count 1- Negligence

110.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

111.    The occurrences made the basis of this suit, and the resulting injuries and damages of the Plaintiffs were proximately caused by the negligent conduct of the Defendants.  Defendants were negligent by breaching the duty that was owed to the Plaintiffs, to exercise ordinary care in one or more of the following acts or omissions, constituting negligence:

> a. Failing to exercise the care necessary under the circumstances;
>
> b. Failing to do what a reasonable daycare would have done under the circumstances;
>
> c. Failing to intervene to ensure a child's safety;
>
> d. Failing to provide proper supervision;
>
> e. Failing to properly hire, qualify, train and supervise its employees
>
> f. Failing to provide reasonable accommodations
>
> g.  Failing to adhere to the Texas Minimum standards for childcare.

112.    Defendant had a duty to exercise ordinary care in caring for and supervising the children in its care so as to prevent injury to Plaintiffs H.P., R.P. and L. P.

113.    Defendant had a duty to maintain a safe environment for children in its care;

114.    Defendant had a duty to hire, train, and supervise caregiver employees to ensure children were not subjected to inappropriate medical treatments or action plans and to prevent injury to Plaintiffs and other children similarly situated.

115.    Defendants breached the duty of care by failing to care for the children, failing to supervise the children, ailing to use positive methods of discipline, failing to stop discrimination, failing to provide accommodations, and failing to properly train, hire, and supervise its employees.

116.    Defendants' negligent acts and/or omissions, and breach of duties, directly and proximately caused injury to Plaintiffs, which resulted in significant damages.

**B. Count 2- Negligence Per Se**

117.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

118.    Defendants failed to exercise the mandatory stand of care in violation of the minimum standards for childcare.

119.    Texas law requires that discipline be positive and encourage self-esteem, self-control, and self-direction. 26 TAC 744.501. Repeatedly, AMS failed to use praise and encouragement, instead using humiliation and rejection with H.P.

120.    Texas law has specific maximums on the number of children that can be in a room. 26 TAC Sec. 746.1601-1615.  These numbers were exceeded or the Ponder children were sent home to accommodate the new students after the holidays.

121.    Accommodations recommended by qualified professionals and medical experts were not provided to H.P. in violation of 26 TAC 746.2202.

122.    AMS failed to encourage H.P. to express feelings and failed to give him appropriate attention.  20 TAC 746.2601

123.    AMS failed to comply with the regulations regarding naptimes and food service for H.P. 26 TAC Sec. 746.2901-2911; 26 TAC Sec. 746.3301-3321.

124.    AMS failed to notify the Ponders that AMS refused to administer or allow students to take ADHD medications in violations of 26 TAC Sec. 746.3811.

125.    AMS failed to follow the laws regarding release of children.  26 TAC Sec. 746.4103

126.    Additionally, according to AMS staff, AMS had 39 children in the Casita at one time, the location used for young children to nap.  Clearly the state of Texas created these regulations to protect children.  The violation of these statues harmed the Ponder family.

127.    Defendant Gonzalez violated the law by practicing medicine without a license.  Defendants AMS and Baker supported and assisted Gonzalez in her medical endeavors.

128.    Plaintiffs were, at all times, members of the class that the statutes the Defendants violated were designed to protect.

129.    Defendants' violation of the statutes were the proximate cause of Plaintiffs' injuries.

130.    As a result of the Defendants illegal acts and/or omissions in violating the statues Plaintiffs sustained injuries.

**C. Count 3- Gross Negligence**

131.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

132.    Defendants conduct was more than momentarily thoughtlessness or inadvertence.  Rather, the acts and/or omissions by Defendants constitute gross negligence as defined in the Texas Civil Practice and Remedies Code.

133.    Defendants conduct involved an extreme degree of risk, considering the probability and magnitude of potential harm to the Plaintiffs.  Defendants had actual, subjective awareness of the risk involved, but, nevertheless, proceeded in conscious indifference to the rights, safety, and/or welfare of the Plaintiff and/or other similarly situated individuals.  Plaintiffs suffered damages and further seek punitive damages.

**D.  Count 4- Negligent Activity**

134.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

135.    Defendant AMS is the owner, operator and possessor of the daycare premises.

136.    Defendants H.P., R.P., and L.P. were minor children placed in the care of Defendants and thus an "invitee" to whom Defendants owned a duty to exercise reasonable care.

137.    Defendants owed a legal duty to ensure the Plaintiffs' safety, ensuring employees are necessarily hired, trained, supervised, and terminated in order to maintain a safe environment for children.

138.    Such negligent activity on the part of Defendants proximately caused the injuries and other damages suffered by Plaintiffs.

**E. Count 5- Respondeat Superior**

139.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

140.    The negligence, carelessness, and callousness of Defendant AMS's employees proximately caused the damage and loss suffered by Plaintiffs.    At all ties material to this action, Defendant AMS's employees were acting in the course and scope of their employment.    Accordingly, Defendant's may be held responsible for its employees' negligence under the doctrine of respondeat superior.

**F. Count 8-Breach of Contract**

146.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

147.    Plaintiffs had entered into a valid contract for the provision of childcare services for their three minor children.  There was a meeting of the mind, evidenced by the signing of the contracts, applications, and general paperwork generated by Defendant AMS.

148.    Plaintiffs tendered performance according to the terms of the contact.

149.    Defendant AMS breached its duties and obligations under the contract, both explicit and implicit, pertaining to providing appropriate care, custody, and supervision by all acts stated above.

150.    Defendant AMS's breach was the proximate cause of damages to Plaintiffs, both direct and incidental/consequential.

151.    Further, Plaintiffs seek to recover their attorney fees under the Texas Civil Practices and Remedies Code.

**G. Count 9- Fraud**

152.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

153.    Plaintiffs discovered that Defendants had been defrauding them by making promises and commitments to get Plaintiffs payments and re-enroll their children when Defendants, particularly Defendant Baker, knew the statements were false and that he had no intention of fulfilling.

154.    Defendants made material misrepresentations that were false.  Defendants knew these statements were false or they were made recklessly without any knowledge of the truth and as a positive assertion.

155.    Defendants made the statements with the intention that Plaintiffs would act upon it and Plaintiffs acted in reliance of the representations and causing injury, damages, and harm.

156.    Plaintiffs seek treble damages and attorney fees.

**H.    Count 10- Fraudulent Inducement to Contract and Breach of Contract**

157.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

158.    The Ponders enrolled all their children at AMS because AMS stated that they followed the Montessori teaching paradigm and that they would offer full-day schooling for the three children,

meaning the children would attend AMS from 8 am to 3 pm Monday-Friday. The Ponders relied on these assertions when entering into contracts with AMS.

159.    The mission of the school stated that they are inclusive and "cultivate compassion and respect."  Unfortunately, the administration of AMS lacked compassion and respect for the entire Ponder family.

160.    The teachings of Montessori include "protecting the autonomy and integrity" of a student and developing a program that follows "the developmental states manifested by the children" and "honor and respect each child's individual timetable for development."    Bryant Goertz, Donna. "Children Who Are Not Yet Peaceful: Preventing Exclusion in the Early Elementary Classroom," Frog, Ltd. Berkeley, CA, 2001. "Edmond, Nadia and Tad: The Gift of Time" is the title of chapter twelve.  The Montessori teachings do not include discrimination and refusal to comply with 504 and provide accommodations.

161.    The Ponders were further induced to reenroll for a second year.  The AMS handbook clearly stated that the Guides would be trained by AMI and would engage in the "most authentic standard of Montessori pedagogy" and that the Guides would have an understanding of developmental milestones and ensure a structured learning approach that aligns with the AMI guidance.

162.    AMS further promised to guide students to their fullest potential using the Montessori principles of independence, self-discipline, and social belonging.  These principals were not utilized with H.P.

163.    The AMS parent handbook outlines procedures for programmatic changes that were not followed.  The AMS parent handbook states that AMS will work in partnership with the parents.

AMS refused to provide information, observations regarding the Ponder children, or hold requested conferences.

164.    AMS further stated that it would not discriminate and complies with ADA and Section 504 of the Rehabilitation Act of 1973, as amended.  Grae Baker was the alleged coordinator, yet the school insisted that Jinny Gonzalez be the point person and Grae Baker failed to address or even discuss violations.

165.    AMS fraudulently induced the Ponder family to contract for all three children's education. AMS breached its contracts with the Ponders by failing to provide 504 services for H.P., failing to allow the children to receive full day education, and failing to follow the school policies.

166.    As a result of Defendants fraudulent inducement, Plaintiffs suffered harm, injury and damages.  Further, Plaintiffs seek attorney fees and treble damages.

**J.  Count 11- Civil Conspiracy**

167.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

168.    Defendants acted in combination to seek or accomplish a course of action to commit unlawful acts.  Defendants worked together to perform an illegal activity, namely the practice of medicine without a license and the offering of medical services without being licensed as a medical treatment facility.   There was a meeting of the minds of the Defendants to agree to accomplish the above stated unlawful acts.  Defendants were aware of the intended harm or wrongful conduct at the outset of the combination or agreement.  As a result, Plaintiffs suffered harm, injury and damages.

**I.  Count 12- Retaliation**

169.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

170.    Plaintiffs and Defendants did not agree on the use of medication to treat a child who suffers from ADHD.  While the school did not have a no medication policy, Defendant Gonzalez clearly felt that it was unacceptable to treat H.P. in the manner his physician recommended.  Ms. Gonzalez was not a doctor and had no training or experience to justify her position or the action plans she required.  Ms. Gonzalez had very specific requirements for treatment of H.P., both at home and at school, including requiring the Ponders to drive to school, wake up children in a certain order, and other questionable commands.  AMS allowed Defendant Gonzalez to make these unfounded commands and fully protected her quack medicine.  The Ponders voiced concern over these methods and were shut down by Ms., Gonzalez.  Further, she failed to provide insight on what was occurring in the classroom or how any of her requirements would provide any effective change.

171.    When the Ponders asked to discuss with another staff member and remove Defendant Gonzalez from H.P.'s case, Defendant Baker refused to accommodate, chastised the Ponders for their request, fully supported Ms. Gonzalez, and expelled H.P. in retaliation for Plaintiff's medicating H.P.  The school's support of Ms. Gonzalez's quack medicine is very concerning, as she is not a physician nor trained in any way on the treatment of children with ADHD.

172.    Defendant AAMS retaliated for when the Ponders requested ADHD accommodations under 504 and wanted to follow the treatment plan prescribed by their actual physician instead of following the quack medicine prescribed by Ms. Gonzalez.

173.    Defendants retaliated for the filing of a complaint with the HHS by threatening and later actually expelling the Ponder children.

174.    The Ponders care not only about their own children but about the entire AMS community. When they learned that H.P. had been expelled, they decided to bring their concerns to the attention of other parents, in hopes of making AMS better for all students attending.  The policies and procedures were not followed with H.P.  As such, the Ponders reached out to the community so that the community as a whole, could work together to find ways to foster better communication. The Ponders posted a letter to all parents on the WhatsApp on January 28, 2025.  The letter did not violate any rules of AMS.  AMS had the letter taken down on January 30, 2025.  Yet, as a further act of retaliation, AMS chose to send an email making defamatory statements against the Ponders to all families at AMS.

## VI. DAMAGES

175.    Plaintiffs incorporate by reference the above paragraphs by reference as if stated fully herein.

176.    Defendants' acts and omissions jointly and singularly, were the proximate cause of injuries to Plaintiffs, including but not limited to:

1. Loss of value of the tuition/fees that Plaintiffs paid for the childcare

2. Loss of wages for Mr. and/or Ms. Ponder incurred by having to stay home and care for H.P. and R.P when they were sent home early and while they began the long, slow, and careful process of finding another school/childcare to entrust their children, after undergoing such a traumatic ordeal;

3. Medical expenses for the reasonable and necessary examination of H.P.;

4. Medical expenses for the reasonable and necessary family and individual counseling and therapy for Plaintiffs

5.  The cost of the unnecessary and inappropriate therapies and quack medicine that Defendants required Plaintiffs seek for H.P.

6.  Physical pain and suffering in the past;

7.  Physical pain and suffering, in reasonable probability, sustained in the future;

8.  Mental anguish in the past;

9.  Mental anguish, in reasonable probability, sustained in the future;

10. Lost wages in the past;

11. Lost wages, in reasonable probability, sustained in the future;

12. Loss of wage-earning capacity in the past

13. Loss of wages/earning capacity, in reasonable probability, sustained in the future;

14. Loss of normal enjoyment of the pleasure of life in the past;

15. Loss of normal enjoyment of the pleasure of life, in reasonable probability, sustained in the future;

16. Treble damages;

17. Punitive damages;

18. Pre-judgment interest;

19. Post-judgment interest;

20. Court costs;

21. Reasonable and necessary attorney fees;

22. Costs of suit

## VII.  CONDITIONS PRECEDENT

177.  All conditions precedent have been performed or occurred, except for mediation which is addressed below.

## VIII. JURY DEMAND

178.    Plaintiffs respectfully demand the right to have a trial by jury and have tendered the jury

fee in Travis County District Court.

## X.    PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer, and that on final

trial Plaintiffs have and recover:

1.  Judgment against Defendants for a sum in excess of the minimum jurisdictional limits

    of this Court;

2.  Pre-judgment at the highest legal rate;

3.  Reasonable and necessary attorney's fees;

4.  Taxable Court costs;

5.  Post-judgment interest on the above amount at the highest legal rate; and

6.  Such other and further relief to which Plaintiff may show themselves justly entitled in

    law or equity.

Respectfully submitted,

**WELBORN LAW LLC**
1100 West Ave.
Austin, Texas 78701
Telephone:  (512) 825-3390

By:    _/s/ Amy C. Welborn_
       Amy C. Welborn
       State Bar No.  24012853
       amy@welborn-law.com

ATTORNEY FOR PLAINTIFFS

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document has on counsel for

all parties via the electronic service of the efile system.

Chris Schultz
SCHULMAN, LOPEZ, HOFFER, & ADELSTEIN LLP
9011 Mountain Ridge Dr. #210
Austin, TX 78759
cschulz@slh-law.com

*/s/ Amy Welborn*
Amy Welborn

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Amy Welborn on behalf of Amy Catherine Welborn
Bar No. 24012853
amy@welborn-law.com
Envelope ID: 108954770
Filing Code Description: Amended Filing
Filing Description: PLAINTIFF'S THIRD AMENDED PETITION
Status as of 12/11/2025 7:55 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher H.Schulz | | cschulz@slh-law.com | 12/10/2025 3:46:12 PM | SENT |
| Taylor Norman | | tnorman@slh-law.com | 12/10/2025 3:46:12 PM | SENT |
| Elizabeth Angelone | | eangelone@slh-law.com | 12/10/2025 3:46:12 PM | SENT |
| Phylicia McClain | | pmcclain@slh-law.com | 12/10/2025 3:46:12 PM | SENT |
| Amy Welborn | | amy@welborn-law.com | 12/10/2025 3:46:12 PM | SENT |
| Randee Hobbs | | rhobbs@slh-law.com | 12/10/2025 3:46:12 PM | SENT |
| Kim Chambers | | kim@welborn-law.com | 12/10/2025 3:46:12 PM | SENT |
| Jacqueline Hello | | jacqueline@welborn-law.com | 12/10/2025 3:46:12 PM | SENT |
| Jennifer Van Gorder | | jennifer@welborn-law.com | 12/10/2025 3:46:12 PM | SENT |
| Amy Welborn | | amy@welborn-law.com | 12/10/2025 3:46:12 PM | SENT |
| Amy Welborn | | amy@welborn-law.com | 12/10/2025 3:46:12 PM | SENT |
| Chris Schulz | | cschulz@slh-law.com | 12/10/2025 3:46:12 PM | SENT |